642 So.2d 311 (1994)
James Louis JASMIN
v.
HNV CENTRAL RIVERFRONT CORPORATION, et al.
No. 94-C-1497.
Court of Appeal of Louisiana, Fourth Circuit.
August 30, 1994.
*312 John S. Keller, New Orleans, for respondent James Louis Jasmin.
G. Bruce Parkerson, George B. Hall, Jr., William D. Aaron, Jr., Patricia A. Lynch, and Phelps Dunbar, New Orleans, for relator Golding and Companies.
Before SCHOTT, C.J., and WARD and LANDRIEU, JJ.
LANDRIEU, Judge.
The relator, Golding and Companies, is the excess insurer of HNV Central Riverfront Corporation (HNV), one of the defendants in this lawsuit filed by plaintiff-respondent James L. Jasmin who sustained injuries from exposure to Gastoxin, a grain pesticide containing aluminum phosphine. In his petition, Jasmin claimed that the injury resulted from acts committed by HNV and its employees which constitute an intentional tort, an exception to the exclusive provisions of the Louisiana Workmen's Compensation Act. Relator moved for summary judgment contending that, because HNV had neither the requisite intentional desire nor substantial certainty that Jasmin would be injured, it was entitled to a summary judgment as a matter of law. The trial court denied summary judgment on July 13, 1994, without written reasons. Relator applies to this Court for a review and reversal of the trial court's ruling.

Applicable Law
To avoid the general rule that an employee's exclusive remedy for a work-related injury is worker's compensation, a plaintiff must establish that his injury was the result of an "intentional act". La.Rev. Stat.Ann. 23:1032 (West Supp.1994).[1] Allegations of failure to prepare or to use safety devices or failure to comply with regulations are not sufficient to prevent summary judgment under the intentional act exception. Williams v. Gervais F. Favrot Company, Inc., 573 So.2d 533, 541 (La.App. 4th Cir.), writ denied, 576 So.2d 49 (La.1991) "Intent" in this context means that the defendant consciously desired to bring about the physical result of his act or believed it was substantially certain to follow from his conduct. Bazley v. Tortorich, 397 So.2d 475, 481 (La. 1981). "Substantially certain to follow" requires more than a reasonable probability that an injury will occur and "certain" has been defined to mean "inevitable" or "incapable of failing". Thus, an employer's mere knowledge that a machine is dangerous and that its use creates a high probability that someone will eventually be injured is not sufficient to meet the "substantial certainty" requirement. Armstead v. Schwegmann Giant Super Markets, Inc., 618 So.2d 1140, 1142 (La.App. 4th Cir.1993), writ denied, 629 So.2d 347 (citations omitted). Even where a *313 defendant's conduct is grossly negligent, this fact alone will not allow the imputation of intent. Id. Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing. Tapia v. Schwegmann Giant Supermarkets, Inc., 590 So.2d 806, 807-08 (La.App. 4th Cir.1991). Nationwide, policy considerations reflect that the employer's conduct must go beyond knowingly permitting a hazardous work condition to exist, ordering an employee to perform an extremely dangerous job, or willfully failing to furnish a safe place to work in order to constitute an intent to injure necessary under the exception. Id. at 808 (citations omitted).

Factual History
HNV was the operator of a grain storage facility located in Chalmette. The particular warehouse where the injury occurred is a "flat" grain storage facility consisting of several very large "bins" approximately 80 feet by 300 feet. Upon discovery of an infestation, the warehouses were periodically fumigated one bin at a time. This process involved boring holes into the grain and inserting pellets of the pesticide, which would explode, releasing a toxic gas and ultimately leaving a powder residue within or on the grain.
In this instance, the pesticide was applied on October 29, 1987, and in accordance with the product manual, the grain was covered with plastic in order to contain the toxin within the grain and increase the effectiveness of the pesticide. In accordance with the advice of HNV's licensed applicator of restricted-use pesticides, Graydon Fitzgerald, the grain remained covered for several days beyond the calculated exposure time.[2]
On November 4, 1987, the employees of HNV voted to organize a union under the Teamsters. The issue of unionization had been strongly opposed by the management of HNV; the workers felt threatened with job loss and generally intimidated. The next day, November 5, 1987, eight days after the application of the pesticide, a crew of HNV employees which included Jasmin were ordered by the maintenance supervisor, Sam Shahine[3], to enter the warehouse and remove the plastic covering from the hill of grain which was approximately 20 feet high. According to the depositions of Jasmin and two of his coworkers, Charles Thompson and Larry Forbes, prior to going into the warehouse the workers raised objections and requested that the air be tested. Shahine allegedly responded that the air was okay and to "do it or go home."[4] According to his account of events, Larry Forbes did not follow Shahine's orders "because, see, I know he didn't know ... To me, he didn't know he was leading us intoin to a trap, an ambush ... because he didn't know from not being in the grain business or for whatever reason...." Jasmin, however, believed he would lose his job if he refused and proceeded along with the other workers to pull up the plastic covering. After about 10 minutes, Jasmin was overcome by the toxic fumes and dragged from the hill of grain by his coworkers.

Discussion
In his petition, Jasmin alleged that in ordering the workers to remove the plastic *314 covering, HNV intended or had "knowledge to a virtual certainty" that he and other workers would sustain injuries from exposure to the toxic fumes. Relator concedes that HNV may have been negligent in its fumigation procedure, but argues there is no evidence that the injury sustained by Jasmin was intentional on the part of HNV. Respondent contends that "[d]ue to the intentional absence of a Certified Applicator and the intentional failure to use air monitoring and respiratory equipment, both as alleged by the plaintiff, defendants simply cannot prove that they did not `intend' to harm Jasmin."
Respondent misstates the burden of proof on summary judgment. Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law." La.Code Civ.Proc.Ann. art. 966 (West 1984). Once a motion for summary judgment has been made and supported, the opposing party may not rest on the mere allegations of his pleadings but must set forth by affidavit or other receivable evidence specific facts showing a genuine issue for trial or else summary judgment will be rendered against him. La.Code Civ.Proc.Ann. art. 967 (West 1984); Osborne v. Vulcan Foundry, Inc., 577 So.2d 318, 323-24 (La.App. 4th Cir.1991).
In support of its motion for summary judgment, relator submitted depositions which show the following: HNV had fumigated grain on prior occasions without harm befalling any of its employees. The first application of Gastoxin was under the direct supervision of a licensed applicator with prior experience using that particular pesticide. HNV left the Gastoxin on the grain for more than the requisite number of days as set forth in the product manual before sending its employees back into the treated area to remove the plastic covering. The HNV supervisor who ordered the men into the storage bin was new to the grain storage business and had no experience with fumigations. Lanis J. "Bud" Viator, HNV president, did not know that the men would be ordered into the grain storage facility without the air having been tested and, according to his testimony, would never intentionally harm his employees. Accordingly, relator made the requisite showing that the harm which befell Jasmin was not intentional and the burden of proof is shifted to the respondent.
Respondent raises the following contentions to prove that a genuine issue of material facts exists. First, Jasmin contends that according to federal[5] and state law, certified applicators must be in direct supervision of the fumigating procedures and neither of HNV's certified applicators, Fitzgerald and Viator, were on the Chalmette site. However, La.Rev.Stat.Ann. 3:3248 (West 1987), cited by respondent in support of this proposition, provides to the contrary:
Persons who hold certificates issued under the provisions of this Chapter may provide direct supervision for the application or sale of restricted use pesticide by competent uncertified persons. The certified person shall be fully responsible for the actions of uncertified persons under his supervision. The certified person shall give instruction and direction to the uncertified persons and shall be available when and if his presence is needed. The certified person need not be physically present at all times unless the commissioner by rule[6] requires the physical presence of the certified person at the time the restricted use pesticide is sold or applied. (emphasis added).
In this case, it is undisputed that Fitzgerald, a licensed applicator, supervised the first application of Gastoxin at the Chalmette facility. Michel Hucke, as well as Viator, admitted that subsequent applications were not performed under the personal supervision of a licensed applicator, but contended that they were in compliance with state regulation because Viator was licensed to apply restricted *315 use pesticides. The clear language of the statute indicates that they are correct in their interpretation of the state regulation and, under these circumstances, intent to harm Jasmin cannot be imputed from the absence of Viator or Fitzgerald on site.
Respondent also contends that the Gastoxin product manual requires that the product be used under the direct supervision and in the physical presence of a certified applicator. However, according to the Gastoxin instruction manual, two trained persons should be present when the pesticide is applied within a confined space or during reentry into a fumigated or partially aerated site. "Application" is defined as the time period covering the opening of the first container, applying the appropriate dosage of fumigant, and closing up the site to be fumigated. Air respirators are required only when "exposure limits cannot be met through engineering controls." It is recommended that the applicator or employer document exposure readings but once exposures have been adequately characterized for a site subsequent monitoring is not routinely required. Suggested exposure time, dependent upon the temperature, ranges from 3-5 days for temperatures above 54 degrees fahrenheit. Following the exposure period in the fumigation of a flat storage bin, the doors and windows should be opened to create a cross draft to aid in aeration. The plastic covering should be removed no more than five to six days after application of the pesticide or sweating of the grain may occur.
While it is problematic whether Viator and the managers of HNV strictly adhered to the Gastoxin manual in applying the pesticide, Jasmin was clearly not injured during the application process which is the interval between the opening of the pesticide containers and the closing of the fumigation site.[7] Further, the Gastoxin manual does not indicate that covering the grain results in special hazards or that precautions should be observed in uncovering the grain; the manual warns only that care should be taken in removing the plastic in a timely manner to avoid harming the grain.[8]
Respondent contends that the lack of masks[9] or other safety equipment supports his claim of an intentional tort. However, there is nothing in the manual to suggest that such equipment is standard issue except in the application procedure when the exposure level is found to be unacceptable or during reentry into a partially aerated site. In this case, HNV had the necessary equipment and it was apparently customary[10] to test the air quality of the warehouse prior to the removal of the plastic covering. However on November 5, 1987, the employee generally responsible for such testing was on vacation. Although a ventilation system existed in the warehouse, according to Charles Thompson the fans were not used "because as the grain was going in, like ventilator systems that they had built, the grain was like smooching it, knocking it down and stuff, and they just was covering them as they go." We note that neither party submits evidence as to when or if the doors and windows of the warehouse were opened after fumigation to aid in aeration, as suggested by the manual for fumigating flat storage bins. However, in Fitzgerald's deposition, he reasoned that based on a seventy-two hour exposure period, several days of "grace period" over and above this designated exposure time, as well as the extensive amount of open space within the building which included thirty or forty feet of open space above the grain, that after eight days "there's nothing in there to air out."
*316 A careful review of the evidence submitted by the parties indicates that, as the relator concedes, HNV may have been grossly negligent in failing to provide the plaintiff with a safe work environment. Respondent vaguely alleges that he was purposely injured in retaliation for his support of the unionization of the company, but fails to produce any evidence of a genuine issue of material fact regarding the defendant's intent. Accordingly, relator's application for supervisory writs is granted, the ruling of the trial court is reversed, and summary judgment is rendered in favor of Golding and Companies.
REVERSED; SUMMARY JUDGMENT GRANTED.
NOTES
[1] La.Rev.Stat.Ann. § 23:1032(B) provides that "[n]othing in this Chapter shall affect the liability of the employer ... to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act."
[2] HNV's statement of undisputed facts alleges that the October 29th application was the first time that HNV had used the brand Gastoxin and that on that date Fitzgerald organized and performed the fumigation procedure. However, Jasmin's summary of facts indicates that Fitzgerald went to the Chalmette facility in September 1987 and fumigated another bin. HNV's statement is clearly inaccurate as to the use of Gastoxin; Fitzgerald had previously used Gastoxin at HNV's facility in Bernice and, in any event, the pesticide previously used at the Chalmette facility was comprised of the same essential chemicals. Further, although it is unclear when Fitzgerald applied the Gastoxin at the Chalmette facility (his excerpted deposition does not indicate the date), the excerpted deposition of Mike Hucke, a supervisor at the Chalmette facility, suggests Fitzgerald and his crew fumigated a bin approximately 6 weeks prior to the October 29th application.
[3] Sam Shahine, hired in October 1987 as a maintenance supervisor, had no prior experience in the grain industry or fumigation.
[4] Shahine stated in his deposition that he never had an air testing device while at the Chalmette facility and did not remember supervising the removal of any coverings.
[5] Respondent cites only generally to the "Federal Insecticide, Fungicide and Rodenticide Act." In any event, state law is controlling in this instance and does not support respondent's position.
[6] We note that there is no indication in the record that such a rule applies to Gastoxin.
[7] Jasmin stated in his deposition that he did not "treat" the grain that he was removing the plastic from.
[8] Fitzgerald stated that the exposure time, i.e. the time in which the gas broke down, was not affected by the covering of the grain.
[9] We also note that we find no evidence in the depositions of Charles Thompson, Larry Forbes, or Jasmin himself that the workers requested masks prior to entry into the warehouse.
[10] Michael Hucke stated that it was his practice, as well as Lloyd Duffy's, to use the equipment after each fumigation. In response to a query as to whether this practice was relayed to Mr. Shahine, Hucke replied "[h]e didn't do it. He's an older guy and and he's not going to walk up on top of that grain to see if it's gas free or not."