815 So.2d 1016 (2002)
Paul BARNETT, et al.
v.
MERIDIAN RESOURCES & EXPLORATION CO., et al.
01-1114.
Court of Appeal of Louisiana, Third Circuit.
February 6, 2002.
Writ Denied May 3, 2002.
*1017 Jennifer Jones Bercier, Jones Law Firm, Cameron, LA, Counsel for Paul Barnett.
Daniel James Caruso, Simon, Peragine, Smith & Redfearn, L.L.P., New Orleans, LA, Counsel for Petroleum Engineers, Inc.
Hugh M. Glenn, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, LA, Counsel for Zurich Insurance Co.
Morgan J. Wells, Jr., Larzelere, Picou & Wells, L.L.C., Metairie, LA, Counsel for the Meridian Resource & Exploration Company.
Thomas Joseph Solari, Woodley, Williams, Boudreau, Norman, Brown & Doyle, Lake Charles, LA, Counsel for the Meridian Resource & Exploration Company.
Charles A. Watson, Frederick Wagner, Watson & Tramonte, Houston, TX, Counsel for Petroleum Engineers, Inc.
Court composed of ULYSSES GENE THIBODEAUX, MARC T. AMY and ELIZABETH A. PICKETT, Judges.
AMY, Judge.
The plaintiff filed suit against an oil exploration company seeking damages related to injuries he sustained in a fire while working in the company's oilfield. In response, the defendant filed motions for summary judgment seeking a determination that the plaintiff was a borrowed employee at the time of the fire and that his injuries were not sustained from an intentional tort. Both motions were granted by the trial court. The plaintiff appeals. For the following reasons, we reverse the summary judgment granted with regard to the plaintiff's status as a borrowed employee, but affirm the determination that the plaintiff's injuries were not the result of an intentional tort. We remand the matter for further proceedings.

Factual and Procedural Background
The plaintiff, Paul Barnett, performed oilfield production hook-up work through Tri-Con Environmental Services, Inc. Following years of working in the oilfield, Mr. Barnett purchased his own truck and tools and began performing hook-up work for various oilfield companies. He had an arrangement with Tri-Con whereby he would obtain the work and use his truck and tools, but the client oilfield company would be billed through Tri-Con. Tri-Con would retain a percentage of Mr. Barnett's billings and would provide Mr. Barnett with insurance coverage. Mr. Barnett previously enjoyed this type of arrangement with DACI, also an oilfield contractor.
On October 13, 1999, Mr. Barnett and his assistant, Stacy Landreneaux, were performing work at a Meridian Resource and Exploration oilfield in Cameron Parish. The two were installing a dump line *1018 on a heater treater or separator at the facility. The plaintiff contends that, on the afternoon of October 13, Wayne Sturlese, a Meridian employee, joined the pair and in an attempt to accelerate the process of bleeding gas from the line, broke a two-inch hammer union. The plaintiff contends that gas began escaping from the line creating a cloud of natural gas around him and Mr. Landreneaux. The gas ignited, burning Mr. Barnett and Mr. Landreneaux.
Mr. Barnett filed suit against Meridian alleging fault for "care, custody, and control of an unreasonably dangerous thing, i.e., a heater treater that did not have a blow[]-down valve...." The plaintiff contended that Meridian knew or should have known of the condition and the danger posed to those performing construction work in the area. Additionally, the plaintiff named the designers of the facility, Petroleum Engineers, Inc., as a defendant alleging that they constructed the defective heater treater. Zurich American Insurance Company, Tri-Con's workers' compensation insurer, filed a Petition of Intervention due to benefits provided to Mr. Barnett. Meridian answered, alleging that Mr. Barnett was a borrowed servant and/or statutory employee who was barred from recovery in tort. This defense was followed by a motion for summary judgment wherein Meridian sought a declaration that Mr. Barnett was working as a borrowed servant. In a supplemental and amending petition, Mr. Barnett alleged that Mr. Sturlese's action in breaking the hammer union "was an intentional and grossly negligent act...." Following this amendment, Meridian filed an additional motion for summary judgment seeking a determination that any actions did not constitute an intentional tort.
Both the summary judgment regarding borrowed servant status and that related to intentional tort were granted by the trial court. Additionally, the trial court granted a motion for summary judgment filed by Petroleum Engineers. All three of the summary judgments granted have been appealed. However, the plaintiff has not addressed any of its argument toward the summary judgment granted in favor of Petroleum Engineers. Therefore, pursuant to Rule 2-12.4 of the Uniform Rules, Courts of Appeal, we consider any assignment related to Petroleum Engineers to be abandoned. We affirm the summary judgment entered in its favor.
The plaintiff argues in brief that the trial court erred in granting both the motion for summary judgment related to the borrowed servant doctrine and that related to intentional tort. The intervenor, Zurich American Insurance Company, has also appealed the summary judgments and has filed a brief with this court. Like the plaintiff, both borrowed servant status and the issue of intentional tort are addressed in the brief.

Discussion
First, we address the plaintiff's contention that the trial court erred in granting Meridian's motion for summary judgment on the issue of whether he was acting as Meridian's borrowed servant, thereby limiting his recovery to workers' compensation benefits. He lists the factors considered in the analysis of the borrowed servant issue and finds genuine issues of material fact remain when considered in light of his submission in opposition to the motion. We agree.
La.Code Civ.P. art. 966(B) provides, in part:
B. The motion for summary judgment and supporting affidavits shall be served at least ten days before the time specified for the hearing. For good cause, the court shall give the adverse party additional time to file a response, *1019 including opposing affidavits or depositions. The adverse party may serve opposing affidavits, and if such opposing affidavits are served, the opposing affidavits and any memorandum in support thereof shall be served pursuant to Article 1313 at least four days prior to the date of the hearing unless there are local rules of court to the contrary. The judgment sought shall be rendered forthwith if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law.
C. (1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.
(2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
While the determination as to whether a borrowed servant relationship exists has been viewed as a matter of law, it is clear that the determination is one with underlying factual inquiries. See Dyer v. Service Marine Indus., Inc., 97-2622 (La.App. 1 Cir. 12/28/98); 723 So.2d 1135. Referencing a previous decision in Johnson v. Rogers & Phillips, Inc., 99-0116 (La.App. 4 Cir. 7/21/99); 753 So.2d 286, and Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir.1969), the fourth circuit explained that the following nine factors are used in considering whether a borrowed servant relationship exists:
(1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation; (2) whose work is being performed; (3) was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer; (4) did the employee acquiesce in the new work situation; (5) did the original employer terminate his relationship with the employee; (6) who furnished the tools and place for performance; (7) was the new employment over a considerable length of time; (8) who had the right to discharge the employee; and (9) who had the obligation to pay the employee.
Vaughn v. BFI Waste Systems of North America, Inc., 01-1105 (La.App. 4 Cir. 7/25/01); 793 So.2d 410. See also Dyer, 97-2622; 723 So.2d 1135; Richard v. Teague, 92-17 (La.App. 3 Cir. 5/4/94); 636 So.2d 1160, writ denied, 94-1934 (La.11/11/94); 644 So.2d 388.
In support of its motion for summary judgment, Meridian introduced deposition excerpts from the plaintiff and Alfred Vaughan, a consultant who works as a pumper with Meridian, as well as affidavits of Sterling Vaughan, a Meridian production superintendent, and Mr. Sturlese. According to the plaintiff's deposition and as explained above, the plaintiff worked through Tri-Con, a relationship that began in 1998. Prior to this, he had worked through DACI. Mr. Barnett would use his *1020 own truck and tools and Tri-Con would retain twenty percent of his billings for his work and the rental of his truck and tools. In exchange for this twenty percent, Tri-Con provided Mr. Barnett with workers' compensation insurance. Mr. Barnett explained in his deposition that he provided his tools, but that if there was additional equipment needed, he would inform Meridian. The company would sometimes rent the equipment for his use. When questioned as to how he would find out what work was to be performed at an oilfield when he arrived for the day, Mr. Barnett explained that he would ask an operator or Alfred Vaughan and they would tell him what they wanted done. He further stated that he would complete it the best way he knew how. He also stated that if Sterling Vaughan arrived at a site and instructed him to go home, he would do so.
Also in support of its motion, Meridian submitted a deposition excerpt of Alfred Vaughan, a pumper who owns his own company, but is a consultant with Meridian. Alfred explained that Meridian uses his services if it has a pump that needs repair and that he helped Mr. Barnett obtain his jobs at Meridian. Alfred also stated that he would often work directly on jobs with Mr. Barnett and would provide him with supervision and instruction. If Alfred needed something, he would call Mr. Barnett directly and not Tri-Con. He further explained that he expected Mr. Barnett to follow his instructions.
The affidavit of Sterling Vaughan, a field superintendent for Meridian, reveals that he was responsible for the hiring of workers, "both directly for Meridian and through employee leasing companies." His duties included the supervision of all of these employees. Sterling explained that he hired Mr. Barnett to work on the construction maintenance crew and did so by communication with him directly, not Tri-Con. Relevant to the control element of the borrowed servant analysis, the affidavit contains the following statement:
It is my understanding when I hired Paul Barnett that Meridian would assign, control, and supervise Paul Barnett's work. To my knowledge, Tri-Con Environmental Services, Inc. never sought to control or supervise Paul Barnett's work at Meridian, and no one from Tri-Con Environmental Services, Inc. ever came to Meridian work sites where Paul Barnett was working.
Relevant to the length of employment element of the analysis, Sterling also explained that: "Paul Barnett was hired on an ongoing basis. He was not hired on a piece-work basis with a specific price for certain task. There was no written contract between Paul Barnett and Meridian, and Paul Barnett's work for Meridian was subject to termination by Meridian at any time without liability."
The affidavit of Wayne Sturlese was also submitted by Meridian. Sturlese, who worked as a pumper/operator at Meridian throughout the year of the accident, explained that when he needed maintenance work performed, he would call Mr. Barnett directly or contact Alfred. Sturlese stated that when Mr. Barnett arrived at his field, he "would tell him what job needed to be performed, where it was to be performed, and when to do the job." He also explained that he "often provided direct and detailed instruction to Paul Barnett regarding the work he would perform for Meridian[,]" and that he considered himself to be Mr. Barnett's supervisor while Mr. Barnett "was performing a construction maintenance job in my presence."
In opposition to the motion, Mr. Barnett filed his affidavit and deposition wherein he explained his working arrangement with Tri-Con, his prior work with DACI, and the number of days worked for different *1021 companies. His testimony indicates that by 1999, the vast majority of his work was for Meridian.[1] He also explained that he owned his own truck, his tools, and that equipment he did not have could be rented. Mr. Barnett explained that it was usually cheaper for Meridian to rent the equipment. As for the element of control, Mr. Barnett's affidavit includes the following statement: "On every job I have no supervision because it is not needed. In the case of the Meridian job, I received no supervision whatsoever from Alfred Vaughan or Wayne Sturlese because they have no idea how to do the hook up. They might be around drawing pay, but they make no contribution to my work." He further stated that "Meridian's employees exercised no control or supervision over me whatsoever because they didn't have anyone on the job that knew anything about what I was doing. Many times with Apache and Meridian, consultant Alfred Vaughan would simply sign my tickets after an hour or so and leave the job." As for the length of his employment, Mr. Barnett explained that the arrangement was the same at every company for which he performed work. He stated: "I worked as long as it took me to complete that particular hook-up job, usually from two weeks to two months. Then I would go to another job. When I finished hooking up a well for one company, I felt free to either go to another company and hook up a well or stay with that company if it had another job."
Further, the plaintiff presented a deposition excerpt of Alfred Vaughan, Meridian's consultant, who explained, in part, his past working relationship with Mr. Barnett. The following colloquy is found in the deposition:
Q. Have you had some occasions in the past where you got your head together with Mr. Barnett and said, I want some work done, particular job to be done?
A. Yeah.
. . . .
Q. And y'all would get together and you told us, I believe, you'd make that list out.
A. Yeah.
Q. You'd decide basically how it was going to be done, right?
A. Right.
Q. Then you'd turn it over to him to do it; isn't that right?
A. Right.
. . . .
Q. You were around there.
A. Yeah.
Q. But you're not doing any work.
A. No. I'm not doing the work.
Q. That's right. Because you trust this man to know what he does, right?
A. To a certain extent. Yeah. I mean, yeah, you know, I ain't going to just turn him loose.
Q. And you don't go give no instructions to any of his hands out there either, do you?
A. No. I don't mess with his hands.
Q. That's his job.
A. That's right.
*1022 Finally, the plaintiff presented the deposition of his assistant, Stacy Landreneaux. Mr. Landreaux explained he heard of the job with Mr. Barnett from Wayne Sturlese, his father-in-law, and that his application for the position was from Tri-Con. The plaintiff maintained the time sheets for both of them. He further explained that if they needed assistance on a job, that the assistance would sometimes come from another Tri-Con employee.
The trial court considered the evidence, concluding that Tri-Con was the plaintiff's nominal employer and that Meridian ultimately exercised control over the plaintiff and Mr. Landreneaux. Our review of Meridian's submission in support of the summary judgment and the plaintiff's evidence in opposition indicates the presence of genuine issues of material fact in this regard. Although Meridian obviously had control over whether the plaintiff was hired for a particular job and could assign Mr. Barnett and his assistant to various tasks, or even order them to leave the site, the plaintiff's submission casts doubt on the extent of this control. While Tri-Con may not have provided active supervision over the plaintiff's activities, evidence raises the question of his own independence from Meridian's control. Whether Tri-Con was his employer or whether he, in reality, acted as his own employer, Mr. Barnett came to the Meridian site with years of experience in the oilfield, providing services to various oil companies. He owned his own truck and tools, hired and supervised his own helper, and was responsible for procuring his own work from the companies he serviced. According to his statement, with the discovery of a new well or field, he undertakes the hook-up, usually lasting from two weeks to two months. The plaintiff explained: "But, I am not committed to anyone for any length of time. I could quit Meridian any day and go elsewhere, but I would not stop in the middle of any job or leave any company who had an immediate need because this would ruin my reputation." Mr. Barnett further stated:
When I finished hooking up a well for one company, I felt free to either go to another company and hook up a well or stay with that company if it had another job. All Alfred Vaughan and Wayne Sturlese did was tell me which well they wanted hooked up and what they wanted me to accomplish. But how to accomplish the job was left up to me.
Mr. Barnett explained that he would be given an assignment by the field operator or Alfred Vaughan and that they would not typically stay around, because "[t]hey had their work to do also." Mr. Barnett explained that: "And I'd go do it the best way I knew how to do it. He didn't point here, this and that. I'd do it my way." He further stated that: "In the case of the Meridian job, I received no supervision whatsoever from Alfred Vaughan or Wayne Sturlese because they have no idea how to do the hook up. They might be standing around drawing pay, but they make no contribution to my work."
In sum, the evidence presented by the parties indicates that genuine issues of material fact remain as to whether the plaintiff was a borrowed servant of Meridian. It is apparent from our review of the statements contained in this evidence that factual questions remain, some requiring credibility determinations. Resolution of this type of issue is inappropriate for summary judgment. Therefore, we find it appropriate to reverse the summary judgment entered in Meridian's favor as to whether Mr. Barnett was acting as a borrowed servant.

Intentional Tort
Although we have reversed the summary judgment as to borrowed servant *1023 status, Meridian filed a separate motion for summary judgment in which it sought a determination that Mr. Barnett was not injured as a result of an intentional tort. The motion was granted by the trial court. In the event Mr. Barnett is ultimately found to be a borrowed servant, the question of intentional tort will be relevant. Therefore, we address the motion.
In contesting the summary judgment, the plaintiff argues that Mr. Sturlese's action in breaking the hammer union under pressure, placing Mr. Barnett and Mr. Landreneaux in a cloud of gas, was of such a nature that there was a substantial likelihood of their injury. In support of his argument, statements from a number of oilfield workers were submitted. In these statements, the workers deny that they would have performed a similar maneuver because they would have been "substantially certain" or "sure" that Mr. Barnett and Mr. Landreneaux would have been injured.
According to La.R.S. 23:1032(A), the provisions of the Workers' Compensation Act are the exclusive remedy for employees suffering from work-related injury or illness, unless the injury/illness results from an intentional act.[2] In Bazley v. Tortorich, 397 So.2d 475 (La.1981), the Louisiana Supreme Court determined that "intentional act" meant either that the actor consciously desired the physical result of the act or that he or she knew that the result was substantially certain to follow from the act, notwithstanding the desire as to the result. In Reeves v. Structural Preservation Sys., 98-1795 (La.3/12/99); 731 So.2d 208, the court observed that, since Bazley, the intentional act exception has been narrowly construed and that even gross negligence has been found to not meet the intentional act requirement. With regard to the question of whether an actor knows that the result was substantially certain to follow, the supreme court explained: "Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation." Id. at p. 9; 731 So.2d at 212. The court further stated:
"`Substantially certain to follow' requires more than a reasonable probability that an injury will occur and `certain' has been defined as to mean `inevitable' or `incapable of failing.'" Jasmin v. HNV Cent. Riverfront Corp., supra [642 So.2d 311] at 312 [(La.App. 4 Cir.1994)]. "[A]n employer's mere knowledge that a machine is dangerous and that its use creates a high probability that someone will eventually be injured is not sufficient to meet the `substantial certainty' *1024 requirement." Armstead v. Schwegmann Giant Super Markets, Inc., 618 So.2d 1140, 1142 (La.App. 4 Cir.1993), writ denied, 629 So.2d 347 (La.1993). "Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing." Id. (citing Tapia v. Schwegmann Giant Supermarkets, Inc., 590 So.2d 806, 807-808 (La.App. 4 Cir. 1991)).
Id. at p. 9-10; 731 So.2d at 213. Our review of the evidence indicates that Meridian is correct in asserting that its employee's role in the accident at issue does not rise to the level of intentional tort.
As stated above, Mr. Barnett and Stacy Landreneaux were at the Meridian field on the day of the accident and were engaged in connecting dump lines into a line connected to a heater treater. Cecil Joseph Clark, the operator of the field that day, was also present. Meridian's evidence indicates that Mr. Barnett and Mr. Landreneaux began attempting to bleed the pressure from the heater treater. A valve was opened in an attempt to reduce the pressure and natural gas began escaping. Sometime later, Wayne Sturlese arrived at the field and, in an attempt to further reduce the pressure, uncoupled a hammer union, allowing more gas to escape. The men continued working in the area. A few minutes later, the natural gas ignited, burning Mr. Barnett and Mr. Landreneaux.
In support of its motion for summary judgment on the issue of whether the plaintiff's injuries resulted from an intentional tort, Meridian presented deposition excerpts from the plaintiff, Mr. Clark, and Mr. Sturlese. The three depositions set forth the background of what occurred on the day of the accident. Mr. Sturlese testified that he had previously bled pressure from a heater treater at this Meridian facility and had done so by uncoupling a union like that involved in this matter. When asked how many times he had done so, Mr. Sturlese replied: "Six or eight, eight times, somewhere in the area. You've got to do that to clean out your heater treater or your waterways." He denied that a fire occurred on these prior occasions. The following colloquy is also found in the deposition:
Q Did you have any reason to believe that a fire would occur in this case?
A No, sir.
Q Mr. Barnett has alleged in his first supplemental amending petition that and I'll quote Wayne Sturlese, that's you, was substantially certain that burned [sic] injuries to the plaintiff would follow from his actions of breaking the hammer union allowing said natural gas to escape unquote. First of all was natural gas already escaping before you broke that two inch union?
A Yes, sir.
Q Did you intend to injure Paul Burnett in this case?
A No, sir.
Q Your son-in-law was there, too, correct?
A Yes, sir.
Q He's married to your daughter?
A Yes, sir.
Q Did you intent to injure your son-in-law?
A No, sir.
Mr. Sturlese continued, stating that he was closer to the union than Mr. Barnett and denying that he intended to injure himself. When asked whether he believed that any incident or accident would occur, he responded: "No, sir, we had done it before."
Meridian also presented the affidavit of Sterling Vaughn, Production Superintendent *1025 for Meridian. Contained in the affidavit is the following statement:
During my employment with Meridian and also during my prior employment with Petroleum Engineers, Inc. I worked extensively at the Meridian Cameron Field where Paul Barnett was injured in a fire on October 13, 1999. I first began working at this facility on September 16, 1996, when the plant was completed. While so employed, I have performed work on the heater treaters at this plant including the heater treater for Well No. 27-2. Before Paul Barnett's accident occurred, I bled pressure off the 27-2 heater treater on at least fifty (50) to sixty (60) occasions by uncoupling the hammer union on the two inch gas outlet line in the same manner as was done by Wayne Sturlese as described in his deposition conducted on February 23, 2001, which I have reviewed.

(Emphasis added.)
In opposition to the motion for summary judgment, the plaintiff filed the deposition of Wayne Sturlese, who testified that he was aware that natural gas would burn, that a spark could ignite the gas, and that bleeding natural gas in the oilfield is dangerous. He also agreed that, due to its danger, there are certain times when bleeding down gas that others should not be in the area. Mr. Sturlese stated that he did it himself in this instance rather than having anyone else do it because of the danger. When asked whether, at the time he opened the union, he knew that Mr. Barnett and Landreneaux should not have been so close, Mr. Sturlese responded: "Yeah, should not have been that close." However, he did not tell the two men to move.
The plaintiff also produced the statements of a number of oilfield workers regarding the danger of the operation performed. For example, Charles Boudreaux, who identified himself as having worked in the oilfield since 1958 as a roughneck, roustabout foreman, and operator, stated in his affidavit that:
My job required me to bleed down gas many times. I attended many safety courses and schools. I learned to never bleed gas in a manner that it would cover other workers like a cloud. This is what I am told was done by Wayne Sturlese when he broke a hammer union and the gas escaped like a cloud and covered Paul Barnett and Stacy Landreneaux. I would never have done this because I would fear for my own safety. I would be sure that somebody in a cloud of gas would be injured either from breathing the vapors or something igniting the gas. It is just too dangerous. Anybody who has worked in the oil field like me as a production foreman and operator would know the same thing.
Similarly, the following colloquy is found in the statement of Burl LaBove who worked as a production foreman:
Q. You heard Mr.I believe you heard Mr. Peterson say he thought this wouldthat when he did this, this put theput the lives of Mr. Barnett and Mr. Landreneaux in jeopardy. Do you agree with
A. Yeah. I agree, a hundred percent.
Q. Okay. And under these circumstances Mr.is one of the reasons you wouldn't do it is becauseyou wouldn't do what he did is because you would be substantially certain that Paul or Stacy were going to get injured?
A. Yes, sir.
Others testified similarly. These statements regarding the workers' certainty that injury would followed are advanced as *1026 indication of intentional tort by the plaintiff. We disagree.
Although the plaintiff has produced the above statements, the workers' mere affirmation when questioned as to whether they were "substantially certain" that injury would follow may introduce the term of art for consideration, but does not indicate that anyone had the level of certainty of the risk referenced by the discussion in Reeves. In fact, although the statements offered by the plaintiff indicate that all realized the danger posed, the operation was performed, even with the acknowledgment of the risk. For example, in the statement of Hans Peterson, offered by the plaintiff, the following colloquy is found:
Q. Okay. Now, my question to you is, first of all, would you ever break a two inch union and release a cloud of gas to where it would cover two of your co-workers?
A. If I was in a situationI don't know their situationI know if I had to break a union, I would make sure there was no other individuals around there besides me. If I had to break it the only way to release pressure, I would have everybody else out [of] the way.
Q. All right.
A. And I would be in there by myself.
. . . .
Q.... [W]hy wouldn't you release gas like this, where it would cover, like a cloud, your coworkers?
A. Well, youthe possibility of an ignition source.
Q. Now, is that something that you would know
A. Well, sometimes you
Q.not to do?
A. Yeah. It's something you know not to do, but sometimes you do things you're not supposed to do.
Q. I understand that. Okay. I understand that. Now, I believe I talked to you yesterday and would thewould the reasonand I believe you told me when you talked to me yesterday, I wrote this down, "I would never break a two inch hammer union under pressure that would put co-workers in a cloud of gas because this would put their life in jeopardy."
A. Well, I told you, if I had to break something I thought was under pressure, I'd tap it and I would be there by myself.
Further, Mr. Sturlese testified that he had bled pressure from the heater treater previously at this facility and, on this occasion, did so with his son-in-law present. He denied intending to injure anyone, including himself, and stated that if he had been substantially certain that an accident would occur, he would not have uncoupled the union. Further, Sterling Vaughn's affidavit indicates that he bled the pressure from the heater treater on at least fifty or sixty occasions and that he had never experienced the type of flash fire that injured the plaintiff.
Although certainly dangerous and arguably negligent, the conduct described by the parties involved was performed by those in the oilfield. The above evidence reflects the practice. Further, the maneuver, until this time, had been performed by those involved without a fire.
In Reeves, 98-1795, p. 9; 731 So.2d at 213, the supreme court quoted language indicating that: "`Substantially certain to follows' requires more than a reasonable probability that an injury will occur and `certain' has been defined to mean `inevitable' or `incapable of failing.'" Even gross negligence or reckless or wanton conduct has been found to be insufficient to reach the level of intentional wrongdoing. *1027 Id. Similar to the instant matter, Reeves involved a situation where the plaintiff was injured after an accident resulted from a maneuver that had been repeatedly performed. The supreme court stated:
Although the jury was told that the supervisor feared that someone would eventually get hurt by manually moving the pot, it is undisputed that plaintiff, as well as other SPS workers, had moved the pot manually on several occasions and no one had ever been injured. In addition, the supervisor testified that when he asked plaintiff and the coworker to move the pot on the day of the accident, he believed that they could do so without incident. In fact, plaintiff had already moved the pot halfway by himself with no trouble. Thus, it cannot reasonably be said that it was substantially certain that plaintiff would be injured by manually moving the pot.
Id. at p. 10; 731 So.2d at 213.
As in Reeves, the operation performed at the Meridian oilfield had been performed numerous times and had not resulted in a fire, despite the risk. Furthermore, Mr. Sturlese uncoupled the union, placing not only himself at risk, but others as well, including the plaintiff and his son-in-law, Mr. Landreneaux. Although perhaps he was aware of the danger as were others, it is apparent that he did not appreciate that the risk was so high as to be certain that injury was "`inevitable' or `incapable of failing.'" Reeves, 98-1795, p. 9; 731 So.2d at 213. Accordingly, the trial court did not err in granting the motion for summary judgment as to intentional tort.

DECREE
For the foregoing reasons, the summary judgment regarding the issue of whether the plaintiff, Paul Barnett, was a borrowed servant, is reversed. The summary judgment entered in favor of the defendant, Meridian Resources and Exploration Company, regarding intentional tort is affirmed. Also, the summary judgment entered in favor of Petroleum Engineers, Inc. is affirmed. Except for the dismissal of Petroleum Engineers, the dismissal of the parties listed in the trial court judgment dated April 18, 2001 is reversed and this matter is remanded to the trial court for further proceedings. All costs are to be divided equally between the plaintiff, Paul Barnett, and the defendant, Meridian Resources and Exploration Company.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
THIBODEAUX, J., concurs in part and dissents in part and assigns written reasons.
THIBODEAUX, J., concurring in part and dissenting in part.
I agree with the majority's treatment of the borrowed servant issue. That is, I agree to reverse the summary judgment which was granted in Meridian's favor.
I disagree, however, that we should affirm the summary judgment granted on the issue of intentional act. There are just too many unresolved factual issues. Additionally, it appears that the majority is weighing the evidence, and that is a jury function which we should not usurp at the summary judgment stage.
Meridian Resources has come forward with sufficiently convincing evidence of the absence of a genuine issue of material fact. However, the plaintiff, the adverse party in this proceeding, has pointed to an abundance of evidence via various affidavits based on personal knowledge on the basis of which a reasonable juror could resolve the disputed issue, i.e., intentional tort, in his favor. The adverse party in a summary judgment proceeding does not have *1028 to show, as the majority seems to say, that he will be able to carry his burden of proof at trial. The majority imposes too heavy a burden on the adverse party. Louisiana Code of Civil Procedure Articles 966 and 967 were not intended to impose such a harsh burden.
Furthermore, Quick v. Myers Welding & Fabricating, 94-282 (La.App. 3 Cir. 12/7/94); 649 So.2d 999, writ denied, 95-0729 (La.4/28/95); 653 So.2d 598, lends jurisprudential support for my position. Quick observed that "the degree to which a welder should be aware of the consequences of an act associated with the welding process" Id. at 1003, was the very issue. Similarly, the very issue in this case is the degree to which Sturlese should have been aware of breaking a two-inch hammer union in the immediate vicinity of the plaintiff under the circumstances of this case. The resolution of this issue is too premature at this stage. That is a function for the trier of fact.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Mr. Barnett explained that, since 1995, when he purchased his own truck and tools, he has worked for a number of companies. His work record is evidenced by work tickets produced and signed by personnel at the hiring oil companies. In 1997, the plaintiff produced thirteen tickets for Meridian, 172 tickets for Apache, and thirty-three for miscellaneous companies. In 1998, sixty two of the tickets were for Meridian, 144 for Apache, and one for another company. The plaintiff testified that in 1999, three of the tickets were for Apache, one was for Hanover, and 228 for Meridian.
[2] La.R.S. 23:1032 provides, in part:

A. (1)(a) Except for intentional acts provided for in Subsection B, the rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages, including but not limited to punitive or exemplary damages, unless such rights, remedies, and damages are created by a statute, whether now existing or created in the future, expressly establishing same as available to such employee, his personal representatives, dependents, or relations, as against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal, for said injury, or compensable sickness or disease.
. . . .
B. Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.