905 So.2d 465 (2005)
Kenneth Paul ZIMKO and Rochelle Lacourrege Zimko
v.
AMERICAN CYANAMID, et al.
No. 2003-CA-0658.
Court of Appeal of Louisiana, Fourth Circuit.
June 8, 2005.
Rehearing Denied July 15, 2005.
*470 Mickey P. Landry, Frank J. Swarr, David R. Cannella, Landry & Swarr, L.L.C., New Orleans, LA, for Plaintiffs/Appellees.
John J. Rabalais, Janice B. Unland, Robert T. Lorio, Paul E. Harrison, Rabalais, Unland & Lorio, Covington, LA, for Defendant/Appellant (Tate & Lyle North American Sugars, Inc.).
Henri Wolbrette, III, Erin Fury Parkinson, Margaret Diamond, McGlinchey Stafford, PLLC, New Orleans, LA, for Defendant/Appellant (American Cyanamid Company).
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, JR., Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR., and Judge ROLAND BELSOME).
PATRICIA RIVET MURRAY, Judge.
This is a wrongful death and survival action arising primarily from alleged household and bystander exposure to asbestos that resulted in the plaintiff, Kenneth Zimko, contracting mesothelioma.[1] After filing this suit, but before trial, Kenneth Zimko died from that disease. Following a bench trial, the trial court found American Cyanamid Company ("American Cyanamid") liable based on household exposure and Tate & Lyle North American Sugars, Inc. ("Tate & Lyle") liable based on bystander exposure. The trial court awarded damages to Kenneth Zimko's surviving spouse, Rochelle Zimko, in the total amount of $3,500,000. For the reasons that follow, we reverse the finding of liability as to Tate & Lyle, finding the workers' compensation exclusivity rule bars such liability; affirm the finding of liability and the damage award for the survival action as to American Cyanamid; and amend the damage award for the wrongful death action as to American Cyanamid based on our allocation of fault 50% to Tate & Lyle and 50% to American Cyanamid pursuant to La. C.C. art. 2323.

FACTS
It is undisputed that Kenneth Zimko had mesothelioma from which he died at the age of fifty-five years shortly before trial. Mrs. Zimko attributes the disease to her husband's household exposure from birth until age eighteen as well as during the summers when he was in college. She attributes the household exposure to Kenneth Zimko's father, Paul Zimko, bringing home from his job at American Cyanamid *471 asbestos fibers that clung to his clothing and his person. She also attributes the disease to her husband's bystander exposure from 1977 until 1990 at his own place of employment, the Domino refinery owned by Tate & Lyle.[2]
The basic facts are relatively undisputed. Kenneth Zimko was born on September 19, 1945, in New Brunswick, New Jersey, and grew up in Middlesex, New Jersey. Throughout Kenneth Zimko's childhood (from birth through age eighteen), his father worked for American Cyanamid at its chemical plant in Bound Brook, New Jersey. Kenneth Zimko identified the various job titles his father had at American Cyanamid as millwright, machinist, mechanic, union worker and boiler house supervisor. According to Kenneth Zimko, his father's job title during the time Kenneth was a childthe late fifties, sixtiesand during the years he was going to collegemid-sixtieswas boiler house supervisor. Although he went to the American Cyanamid facility on several occasions to pick his father up from work, Kenneth Zimko never actually went inside the facility. He always stayed in the parking lot, which was located outside the gate to the facility.
After graduating from high school in the early 1960s, Kenneth Zimko attended college at Loyola University in New Orleans. During the summers of 1964, 1965, and 1966 when he was in college, Kenneth Zimko lived at home with his parents in New Jersey and worked at Johns-Manville Corporation. While employed there, he went to the Johns-Mansville Production facility only once for five minutes, albeit in conditions that were so dusty that he was unable to see.[3]
While attending college, Kenneth Zimko met Rochelle Zimko, who was also a Loyola student. In 1965, Rochelle Zimko visited the Zimko's house in New Jersey for the first time. She described the house as follows:
It was a very small house. The living quarters were above ground. They had two tiny bedrooms, a small bathroom, a small kitchen, a small living room, and a small eating area. And then down below, they had a basement that was the size of the entire upstairs area. The basement had a pantry where his mother kept food; it had his father's tool bench; it had a play area; and it had a washing machine.
Since the time of their marriage in 1969, Kenneth and Rochelle Zimko have resided in the New Orleans area. They had no children.
From 1970 to 1977, Kenneth Zimko had no reason to believe he had any exposure to asbestos. From 1977 until 2001, he worked at Tate & Lyle's Domino Sugar Refinery in Arabi, Louisiana where he had reason to believe he was exposed to asbestos. Although he had an office in the administrative building, he would take a shortcut, especially during inclement weather, through the first floor of the boiler house. In that area of the refinery, there was disintegrating insulation covering on the overhead piping. Because he later saw a lot of the same piping covered up with metallic sheeting with the words *472 "contains asbestos" stenciled onto the sheeting, he believed this insulation contained asbestos. Kenneth Zimko had no direct involvement in the asbestos abatement projects that Eagle, Inc worked on at the Domino refinery.[4] However, he once accidentally barged into an asbestos abatement area that was not marked off completely, but he quickly scampered out.
On one occasion when his father was visiting him in New Orleans, Kenneth Zimko took his father to see the Domino refinery where he worked. According to Kenneth Zimko, his father's comparison of the American Cyanamid facility in Bound Brook, New Jersey to the Domino refinery in Arabi, Louisiana was that "it was like an aircraft carrier compared to a  to a PT boat;" his father considered the size of the Domino boilers to be toys compared to the ones at the American Cyanamid facility.
On September 21, 2000, Kenneth Zimko was diagnosed at Ochsner Clinic in New Orleans with malignant mesothelioma, a terminal cancer. This suit followed.

PROCEDURAL BACKGROUND
On February 9, 2001, Kenneth and Rochelle Zimko filed a petition for damages against nineteen defendants. The named defendants are described as including "miners, manufacturers, sellers, users, distributors, and/or suppliers" of asbestos products who contributed to Kenneth Zimko's asbestos exposure and subsequent contraction of mesothelioma. The named defendants include Kenneth Zimko's employer, Tate & Lyle; his former employer, Johns-Manville; and Paul Zimko's (Kenneth Zimko's father) former employer, American Cyanamid.
Focusing on the latter three employer-defendants, the petition alleges that Kenneth Zimko was exposed to injurious levels of asbestos predominately from the following three sources:
(i) Asbestos fibers brought home on the clothes and person of his father, Paul Zimko, now deceased, from 1945 through 1966 from his employment at American Cyanamid's facility in Bound Brook, New Jersey, in various trades, including but not limited to machinist, millwright, mechanic, and boiler house supervisor. While Paul Zimko used, handled, or was in the vicinity of others using or handling asbestos or asbestos-containing products at that facility, dangerously high levels of asbestos fibers escaped into the ambient air of the work place and contaminated his work clothes and subsequently the family house and Petitioner [Kenneth Zimko];
(ii) Asbestos fibers present within Johns-Manville Corporation's facility in Manville, New Jersey, as Petitioner [Kenneth Zimko] was employed as a laborer during the summers of 1964, 1965 and 1966; and
(iii) Asbestos fibers present with[in] the Domino Sugar Refinery in Arabi, Louisiana [which is owned by defendant, Tate & Lyle], as Petitioner [Kenneth Zimko] was employed in various capacities from 1977 until the present [2001].
As to American Cyanamid and Tate & Lyle, the petition alleges strict premises liability and negligence under La. C.C. arts. 660, et seq., 2315, and 2317. As to Tate & Lyle, the petition also alleges fraud and an intentional act.
*473 On May 16, 2001, Mrs. Zimko filed a First Supplemental and Amended Petition to reflect Kenneth Zimko's death on May 15, 2001, and to assert a wrongful death claim against the named defendants. Mrs. Zimko became the sole plaintiff.
On May 8, 2002, when the bench trial in this matter commenced, only five defendants remained. The remaining defendants were Tate & Lyle, American Cyanamid, Eagle, Garlock, and the McCarty Corporation. The other defendants were dismissed before trial either voluntarily or through summary judgment. Although Tate & Lyle and American Cyanamid also filed motions for summary judgment, those motions were denied.
At trial, Mrs. Zimko's case consisted of the testimony of six witnesses; to-wit: (1) herself; (2) Frank J. Schuber, Eagle's vice-president; (3) Dr. Victor L. Roggli, a renowned pathologist; (4) Dr. Arnold Brody, a professor of pathology at Tulane University Medical School, who is an expert on asbestos and its effects on the lung; (5) Frank M. Parker, III, an industrial hygienist; and (6) Dr. Julia Laurence, Kenneth Zimko's treating oncologist. Mrs. Zimko also introduced Kenneth Zimko's videotape deposition taken on March 21, 2001, and a video tour of the Domino refinery taken in 2000; these two videotapes were played at trial. Finally, she introduced various documentary evidence, including Kenneth Zimko's medical records, Alphonso Lou's deposition, and a copy of the "1951 Walsh Healy Act."[5]
During the presentation of Mrs. Zimko's case (immediately following Frank Schuber's testimony), Mrs. Zimko's counsel announced that a confidential settlement had been reached between Mrs. Zimko and Eagle. Based on that settlement, Mrs. Zimko's claims against Eagle were dismissed with prejudice by order dated June 21, 2002.
After Mrs. Zimko rested her case, the trial court granted the unopposed motions to dismiss filed by the McCarty Corporation and Garlock. Also at that juncture, Tate & Lyle and American Cyanamid filed motions for involuntary dismissal. The trial court denied Tate & Lyle's motion, which asserted that Mrs. Zimko's claims were barred by the workers' compensation exclusivity rule. American Cyanamid's motion was based on two grounds;[6] to-wit:
 La. C.C. art. 3543 required application of New Jersey law to claims against it because the conduct that allegedly caused the injury occurred in New Jersey and because Mrs. Zimko's expert, Dr. Brody, testified that the injury had occurred there and because New Jersey law does not provide a cause of action based on the evidence against American Cyanamid.
 Mrs. Zimko did not present evidence regarding causation under any theory; the evidence failed to support the opinion of Mrs. Zimko's experts that exposure to asbestos from American Cyanamid's plant was a substantial contributing cause of Kenneth Zimko's mesothelioma.
Although the trial court took American Cyanamid's motion under advisement, it never expressly ruled on it.
*474 At trial, Tate & Lyle presented numerous exhibits and the testimony of three of the members of its managementJames D. Roussel, Peter M. Maraia, and Fred G. Goodrow.
American Cyanamid's case consisted solely of the introduction of five documents. Three of the documents are excerpts from Paul Zimko's employment file. Each of these excerpts are one page forms documenting Paul Zimko's transfer from one department to another. These forms are dated September 15, 1941; September 9, 1942; and April 1, 1947. The other two documents are copies of American Cyanamid company newsletters. The first is dated July 25, 1958 and includes an article entitled "Set Up New System for Dispensing Of Freshly Cleaned Work Clothing." The second is dated February 6, 1948 and includes an article entitled "Industrial Hygienists Tackle Dust and Fumes" and subtitled "Extensive Program Underway to Prevent Air Pollution in Plant and Surrounding Area."
On July 10, 2002, the trial court rendered its original judgment in favor of Mrs. Zimko against Tate & Lyle, American Cyanamid, and Eagle in the amount of $2,500,000 on the survival action (inclusive of medical expenses) and $1,000,000 on the wrongful death action (inclusive of funeral expenses) plus interest and costs. Mrs. Zimko, Tate & Lyle, and Eagle (at this juncture a non-party) filed motions for new trial for reargument only pursuant to La. C.C.P. art.1971. Tate & Lyle's motion sought to have the trial court recast its judgment to reflect that Eagle was dismissed by settlement and, pursuant to La. C.C.P. arts. 1812(C) and 1917, to find "Eagle was at fault and that its fault was a legal cause of plaintiff's damage." American Cyanamid moved to strike Eagle's motion for new trial or, in the alternative, opposed Eagle's motion. Tate & Lyle also opposed Mrs. Zimko's and Eagle's motions for new trial.
On January 6, 2003, the trial court granted Mrs. Zimko's motion for new trial and amended its original judgment in two respects. First, the judgment was amended to award Mrs. Zimko $1,000,000 for the survival action and $2,500,000 for the wrongful death action, inclusive of medical bills. In its written reasons, the trial court explained that "[t]hrough error, the survival damage amount was transposed with the wrongful death amount." Second, the judgment was amended to dismiss Mrs. Zimko's claims against Eagle with prejudice. In its reasons, the trial court stated that it had reviewed a portion of Fred Schuber's testimony regarding the installation of insulation at the Domino plant, which "established that Eagle, Inc. installed non-asbestos containing insulation after the asbestos insulation had already been removed." Based on its review of that testimony, the court found Eagle was not liable. The judgment in this case is thus solely against American Cyanamid and Tate & Lyle. The instant appeal by those two defendants followed.

TATE & LYLE'S APPEAL
Tate & Lyle's principal argument is that Kenneth Zimko's exclusive remedy against it for his mesothelioma allegedly caused by his work-place exposure to asbestos at the Domino refinery was to file a workers' compensation claim. Tate & Lyle thus argues that the trial court erred in apparently finding the "intentional act" exception to workers' compensation immunity applies.[7]
*475 Mrs. Zimko counters that the trial court was not manifestly erroneous in finding the intentional act exception applies. She stresses that Tate & Lyle neither tested the air in its refinery for asbestos nor hired an industrial hygienist for its refinery. She argues that the evidence introduced at trial established Tate & Lyle's actual knowledge, both before and during Kenneth Zimko's exposure at its Domino refinery, that subjecting its employees to occupational levels of asbestos would result in harm.
The general rule in Louisiana is that an employee's exclusive remedy for work-related personal injuries or occupational diseases is in workers' compensation, not in tort. See La. R.S. 23:1032(A). In 1976, however, the Legislature codified an exception for when the employee's injury or disease is caused by an "intentional act." La. R.S. 23:1032(B)(providing that "[n]othing in this Chapter shall affect the liability of the employer . . . resulting from an intentional act.")
In the seminal case Bazley v. Tortorich, 397 So.2d 475, 481 (La.1981), the Louisiana Supreme Court construed the term "intentional act" in Section 1032(B) to mean the same as an "intentional tort." The Court reasoned that "[i]n drawing the line between intentional and unintentional acts we believe the legislative aim was to make use of the well established division between intentional torts and negligence in common law." Bazley, 397 So.2d at 480.[8] The Court held that the meaning of intent in this context "is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result." Bazley, 397 So.2d at 481.[9]
Following Bazley, Louisiana courts narrowly construed the intentional act exception. Reeves v. Structural Preservation Systems, 98-1795, p. 6 (La.3/12/99), 731 So.2d 208, 211. In Reeves, the Louisiana Supreme Court summarized its own jurisprudence, noting its holding that "violation of a statute alone is not per se such an intentional act as will result in the employer's tort liability if injuries are sustained by an employee because of the violation." Id. (citing Mott v. River Parish Maintenance, Inc., 432 So.2d 827, 832 (La.1983)(Child Labor Law violation)). The Court in Reeves further noted its holding *476 that an employer's knowingly maintaining a refrigerator used to store paint and food that provided an electrical shock each time an employee came in contact with the metal surface of the refrigerator was not an intentional act. Reeves, 98-1795 at pp. 6-7, 731 So.2d at 211 (citing Casto v. Fred's Painting, Inc., 97-0374 (La.4/4/97), 692 So.2d 408). The Court still further noted that the appellate courts likewise had narrowly construed the intentional act exception and had "almost universally held that employers are not liable under the intentional act exception for violations of safety standards or for failing to provide safety equipment." Reeves, 98-1795 at pp. 7-8, 731 So.2d at 211-12 (collecting a large listing of appellate cases).
Based on the above jurisprudence coupled with the legislative history behind the intentional act exception, the Court in Reeves concluded that it was not an intentional act for an employer to direct an employee to move manually a 350 to 400 pound sandblasting pot despite that this procedure was prohibited by OSHA regulations and despite that the employee's supervisor had specifically requested a forklift from the employer. Addressing the plaintiff's contention that the supervisor's fear that someone would get hurt if the pot was moved manually met the "substantial certainty" test, the Supreme Court reasoned that "[b]elieving that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation." Reeves, 98-1795 at p. 9, 731 So.2d at 212.
As the Court in Reeves noted, a commentator has explained the meaning of "substantial certainty" in this context as follows:
The traditional definition is simply a way of relieving the claimant of the difficulty of trying to establish subjective state of mind (desiring the consequences) if he can show substantial certainty that the consequences will follow the act. The latter takes the case out of the realm of possibility or risk (which are negligence terms), and expresses the concept that an actor with such a certainty cannot be believed if he denies that he knew the consequences would follow. In human experience, we know that specific consequences are substantially certain to follow some acts. If the actor throws a bomb into an office occupied by two persons, but swears that he only "intended" to hurt one of them, we must conclude that he is nonetheless guilty of an intentional tort as to the other, since he knows to a virtual certainty that harmful consequences will follow his conduct, regardless of his subjective desire.
Reeves, 98-1795 at p. 9, 731 So.2d at 212-13 (quoting 14 Malone & Johnson, Louisiana Civil Law Treatise, Workers' Compensation Law & Practice, § 365).
The jurisprudence, as the Court in Reeves noted, has construed "substantially certain to follow" to require more than a reasonable probability that an injury will occur and defined "certain" to mean "inevitable" or "incapable of failing." Reeves, 98-1795 at p. 9, 731 So.2d at 213 (citing Jasmin v. HNV Central Riverfront Corp., 94-1497 (La.App. 4 Cir. 8/30/94), 642 So.2d 311, 312). "Mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing." Reeves, 98-1795 at p. 10, 731 So.2d at 213 (citing Armstead v. Schwegmann Giant Super Markets, Inc., 618 So.2d 1140, 1142 (La.App. 4th Cir.1993)(citing Tapia v. Schwegmann Giant *477 Supermarkets, Inc., 590 So.2d 806, 807-808 (La.App. 4th Cir.1991))).
Since Reeves, the intentional act exception has continued to be narrowly construed as applicable only in very strict and limited circumstances. Cole v. State, Dep't of Public Safety and Corrections, 2001-2123, pp. 7-8 (La.9/4/02), 825 So.2d 1134, 1140-41. As noted above, based on that narrow construction, Louisiana courts almost universally have held that employers are not liable under the intentional act exception for violations of safety standards or failure to provide safety equipment. Reeves, 98-1795 at pp. 7-8 (La.3/12/99), 731 So.2d at 211. As we noted in Jasmin, "[n]ationwide, policy considerations reflect that the employer's conduct must go beyond knowingly permitting a hazardous work condition to exist, ordering an employee to perform an extremely dangerous job, or willfully failing to furnish a safe place to work in order to constitute an intent to injure under the exception." Jasmin, 94-1497 at p. 2, 642 So.2d at 313.
Although a case-by-case analysis is required, Louisiana courts have distilled four dangerous work place situations that almost universally do not form the basis for an intentional act; to-wit:
1. Failure to provide a safe place to work;
2. Poorly designed machinery, failure to follow OSHA safety provisions;
3. Failure to provide requested safety equipment;
4. Failure to correct unsafe working conditions.
12 William E. Crawford, Louisiana Civil Law Treatise, Tort Law 23.3 (2000)("Crawford")(citing Micele v. CPC of Louisiana, Inc., 98-0044 (La.App. 4 Cir. 3/25/98), 709 So.2d 1065).[10] As a result, an employee seeking to establish an intentional act based on harm arising from a dangerous work place situation has a "most difficult [burden] to say that anyone with the employer would allow the dangerous situation to arise out of a desire to harm the employees." Id.
The allegations Mrs. Zimko makes in an attempt to avoid the workers' compensation exclusivity rule fall squarely within the ambit of one or more of the above categories of dangerous workplace situations. Thus, the issue is whether Mrs. Zimko has met her difficult burden of saying anyone associated with Tate & Lyle would allow the dangerous situation to arise out of a desire to harm the employees. The jurisprudence, discussed above, and the facts of this case, discussed below, compel a negative response.
The record reflects that throughout Kenneth Zimko's twenty-four years of employment at the Domino refinery his employer, Tate & Lyle, was aware of unsafe conditions presented by the asbestos insulation on the pipes at its refinery. Mr. Lou, the engineering manager at the refinery from 1976 to 1992, testified by deposition that in 1976 when he began working at the refinery, Domino's corporate headquarters *478 issued a directive to its branches to start encapsulating or removing anything covered with asbestos according to OSHA requirements.
In 1977, when Kenneth Zimko began working at the Domino refinery, the refinery had thousands of feet of pipe insulated with asbestos.[11] In 1983, Domino hired Eagle, a company specializing in asbestos removal and abatement, to remedy those conditions at the refinery and to conduct air testing during its work. Fred Schuber, the Eagle representative who testified at trial, estimated that since 1983 Eagle has performed hundreds of jobs involving asbestos removal and abatement at the Domino refinery. It is not disputed, as Kenneth Zimko testified, that Eagle's employees were present at the Domino refinery site almost daily.[12]
Between 1977 when Kenneth Zimko started work at Tate & Lyle and 1983 when Eagle was hired, it is unclear from the record, what, if anything, was done at the Domino refinery regarding the asbestos insulation.
Mr. Goodrow, the environmental quality assurance and labor relations manager who started at Domino in 1978, and Mr. Maraia, the engineering manager who started at Domino in 1974, both testified that Eagle's employees only wore respiratory protection gear when they were in a contained area performing asbestos removal. Eagle's employees did not wear any type of respiratory protection when they were just walking around the plant. Nor did any of the other workers at the Domino refinery wear any type of respiratory protection. Mr. Goodrow further testified that the Domino refinery is subject to regular inspections from the Louisiana Department of Health and Hospitals, the American Institute of Baking, the American Sanitation Institute, the Occupational Safety and Health Administration, and the Department of Environmental Quality. According to Mr. Goodrow, none of these agencies have ever cited the Domino refinery for an asbestos-related issue.
Mr. Parker, Mrs. Zimko's industrial hygiene expert, reviewed the videotape tour of the Domino refinery done in 2000 and found the refinery to be an unsafe environment with respect to asbestos. He testified that "you can walk in that plant for 5 minutes and know that you've got a real problem on your hands and you need to start doing air sampling and those type of things."[13] Based on this evidence, the trial court found Tate & Lyle liable, noting in its written reasons for judgment the following:

*479  Kenneth Zimko was exposed to asbestos while walking through various area of the Domino plant.
 At one point, his office was housed in an area with asbestos exposed pipes.
 Domino knew of several dangerous exposed pipes, yet did not institute a proper program to eliminate the exposure or to notify the employees of said danger.
 Domino knew, long after it was commonly known, of the danger, and knew of the presence of loose asbestos.
Although we find the record supports the trial court's factual findings,[14] those findings sound in negligence. Indeed, as Tate & Lyle emphasizes, the trial court never used the term intentional. That Tate & Lyle was negligent, and perhaps even grossly negligent, in failing to more aggressively address the hazards presented by the asbestos insulation in its refinery is insufficient to satisfy the strict standard of establishing an intentional act. At best, these findings, which are in agreement with Mrs. Zimko's argument, simply establish that Tate & Lyle knowingly created a dangerous work environment. The jurisprudence, however, consistently has held the intentional act exception does not apply in that context.
Although the members of the Tate & Lyle management who testified acknowledged they knew that asbestos presented health hazards, there is no evidence that anyone associated with Tate & Lyle had any intent to injure Kenneth Zimko. The evidence does not establish that the members of Tate & Lyle management knew that Kenneth Zimko's injury was substantially certain to follow from their conduct or that his injury was inevitable.
Mrs. Zimko argues that Tate & Lyle's exposure of its employees to asbestos was analogous to the illustration regarding a bomb thrown into an office the Louisiana Supreme Court cited in Reeves. Paraphrasing Reeves, she argues that this court "must conclude that [Tate & Lyle] is nonetheless guilty of an intentional tort as to [Kenneth Zimko], since [it knew] to a virtual certainty that harmful consequences will follow [its] conduct, regardless of [its] subjective desire." Reeves, 98-1795 at p. 9, 731 So.2d at 212-13. Tate & Lyle replies that this illustration is inapposite because it is neither common human experience, nor Tate & Lyle's experience, that mesothelioma is known certainly or inevitably to follow from asbestos exposure. We agree.
We also agree with Tate & Lyle's argument that the inference of intent Mrs. Zimko suggests is belied by the fact those whose actual state of mind is at issuethe members of Tate & Lyle management  have exposed themselves voluntarily to the very conditions that Mrs. Zimko claims certainly and inevitably caused injury to her husband. Indeed, the jurisprudence has held that when, as here, a co-employee testifies that he exposed himself to the same conditions as plaintiffs, this "belies any knowledge or belief that the dust contained asbestos and shows an absence of intent to harm plaintiffs." Landry v. Uniroyal Chemical Co., 94 1274, p. 10 (La.App. 1 Cir. 3/3/95), 653 So.2d 1199, 1204; see also Smith v. Tanner Heavy Equipment Co., XXXX-XXXX, p. 2 (La.6/15/01), 790 So.2d 615, 616 (noting that "plaintiff's supervisor was working in the same ditch as plaintiff on the day of the accident and there is no evidence to suggest that he felt *480 that he or the plaintiff was in any danger.")[15]
Although factual findings in workers' compensation cases are subject to the manifest error standard of review, we find the trial court's conclusion that Tate & Lyle's conduct constituted an intentional act was not reasonable in light of the record in this case. See Reeves, 98-1795 at p. 9, 731 So.2d at 213. Because of our conclusion that the intentional act exception does not apply and that the workers' compensation exclusivity rule does apply, we need not address Tate & Lyle's remaining assignments of error.

AMERICAN CYANAMID'S APPEAL
American Cyanamid's arguments on appeal can be grouped into the following five categories: (i) choice of law, (ii) no duty, (iii) insufficiency of evidence of causation, (iv) fault of settling defendant, and (v) application of comparative fault to wrongful death claim.[16] We separately address each of these categories.

(i) choice of law
American Cyanamid argues that, on the evidence presented, a conflict of law analysis was appropriate as to the tort claims against it; such analysis would have required the trial court to apply the law of the relevant state. American Cyanamid identifies the conflict as being that under New Jersey law, unlike Louisiana law, a strict liability cause of action is not recognized against a premises owner. According to American Cyanamid, analysis of this conflict is governed by La. C.C. art. 3543, *481 which provides in pertinent part, as follows:
Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.
La. C.C. art. 3543. American Cyanamid argues, as it did in its motion for involuntary dismissal, that because Mrs. Zimko's expert, Dr. Brody,[17] testified that Kenneth Zimko's injury occurred in New Jersey and because American Cyanamid's alleged conduct occurred at its facility in New Jersey, Article 3543 mandates New Jersey law applies.
As noted above, the trial court failed to expressly rule on American Cyanamid's motion to dismiss, which raised this issue. The trial court did not indicate in its reasons for judgment which state's law it applied in finding American Cyanamid liable for Kenneth Zimko's household exposure. Nor did the court indicate in its reasons whether its finding of liability was based on strict liability or negligence.
Based on our review of the record, we find American Cyanamid's liability in this case is based on negligence. As discussed in detail below, the negligence on which we rely in affirming the trial court's finding of liability is American Cyanamid's failure to take adequate safety measures to prevent its workers from carrying asbestos fibers home on their clothing, body, and personal effects. Given our finding, we find it unnecessary to resolve the conflict issue of whether strict liability under the Louisiana Civil Code articles applies.[18] Rather, because American Cyanamid acknowledges that the negligence standard under New Jersey and Louisiana law is the same, any conflict of law as to American Cyanamid's tort liability in this case is a false conflict. See Eugene F. Scoles, et al., Conflict of Laws 28, n. 16 (4th ed.2004)(noting that "[f]alse conflicts also include cases in which the laws of the involved states are identical, or different, but produce identical results.")

(ii) no duty
To establish a negligence claim, a plaintiff must prove five elements: (i) duty of care owed by defendant to plaintiff, (ii) breach of that duty by defendant, (iii) cause-in-fact, (iv) legal causation, and (v) damages to plaintiff caused by that breach. Davis v. Witt, XXXX-XXXX (La.7/02/03), 851 So.2d 1119. American Cyanamid contends *482 that the first element is lacking. Stated otherwise, it contends that it owed no legal duty to Kenneth Zimko. In support, American Cyanamid emphasizes that the sole source of duty cited by Mrs. Zimko is the Walsh-Healy Public Contracts Act, 41 U.S.C. § 35 et seq., which her expert, Mr. Parker, referenced. As noted, Mrs. Zimko introduced into evidence a copy of the Safety and Health Standards that were promulgated in 1951 pursuant to that statute. According to Mrs. Zimko, these standards recognized the concept of household exposure and mandated employers take specific steps to prevent such exposures. Stated differently, as a result of these standards, she contends asbestos-related injury from household exposure was foreseeable. The pertinent section of these standards is Section H(3)(b), which provides:

Dressing rooms. Workers who handle or are exposed to harmful materials in such a manner that contact of work clothes with street clothes will communicate to the latter the harmful substances [which include asbestos] accumulated during working hours should be provided with facilities which will prevent this contact and also permit the free ventilation or drying of the work clothes while they are not in use.
American Cyanamid argues that the Walsh-Healy Act (and the standards promulgated under it) applies only to employers with government contracts and that there is no evidence it had such contracts. It further argues that the cited standard prescribed procedures intended to limit asbestos exposure to levels below those known to cause asbestosis, yet Mrs. Zimko's experts opined that mesothelioma can be caused by lower levels of exposure. Regardless, it argues there is no evidence that it violated this provision and that even assuming there was such evidence, a mere statutory violation is insufficient to establish negligence under either New Jersey or Louisiana law. Finally, American Cyanamid argues that imposing such a legal duty of care on it toward a person in Kenneth Zimko's position under Louisiana law would be "a novel legal position."
Although we recognize the novelty of the duty we recognize in this case and the lack of Louisiana cases on point, asbestos cases often present novel legal issues. See Hoerner v. ANCO Insulations, Inc., 2000-2333, p. 1 (La.App. 4 Cir. 01/23/02), 812 So.2d 45, 52. Nonetheless, we find, contrary to American Cyanamid's contention, the pivotal issue here is not the existence of American Cyanamid's duty to Kenneth Zimko but rather the breach of that duty or liability.
In so finding, we note that a "no duty" defense in a negligence case is seldom appropriate. As former Justice Lemmon explained:
[A] "no duty" defense generally applies when there is a categorical rule excluding liability as to whole categories of claimants or of claims under any circumstances. In the usual case where the duty owed depends upon the circumstances of the particular case, analysis of the defendant's conduct should be done in terms of "no liability" or "no breach of duty."
Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585, 597 (Lemmon, J., concurring).[19] Thus, resolution of *483 a negligence case based on a finding that a defendant has "no duty" should be reserved for the exceptional situation in which there is " `a rule of law of enough breadth and clarity to permit the trial judge in most cases raising the problem to dismiss the complaint or award summary judgment for defendant on the basis of the rule.'" Id. (quoting Professor David W. Robertson, et al., Cases and Materials on Torts 161 (1989)). This is not such an exceptional situation.
As noted above, we find American Cyanamid's duty is the general duty to act reasonably in view of the foreseeable risks of danger to household members of its employees resulting from exposure to asbestos fibers carried home on its employee's clothing, person, or personal effects. In recognizing this duty, we find instructive the analysis of this issue and the recognition of this duty by the court in In re New York City Asbestos Litigation, 14 A.D.3d 112, 786 N.Y.S.2d 26 (2004)(hereinafter "NYC Asb."). In that case, the plaintiff-wife alleged that she was repeatedly exposed to asbestos as a result of laundering her husband's asbestos-contaminated work clothes over a thirty-year period and, as a result of that exposure, she contracted mesothelioma. On its motion for summary judgment, the defendant-husband's employer (the Port Authority) cited Widera v. Ettco Wire and Cable Corp., 204 A.D.2d 306, 611 N.Y.S.2d 569 (1994), for the proposition that "[t]he common law and statutory duty to provide employees with a safe work place is not extended to encompass individuals who are neither employees nor employed at the work site." NYC Asb., 14 A.D.3d at 114, 786 N.Y.S.2d at 28.
Distinguishing Widera on the basis that it involved injury to an unborn victim, the court concluded that the defendant-Port Authority had a duty. In so doing, the court reasoned that "[a]ssuming the Port Authority knew or should have known of the dangers of secondary exposure, it is hardly a quantum leap to extend the duty of care owed to employees to members of the employee's household who predictably come into routine contact with the employee's clothing. Such persons would certainly fall within the `range of reasonable apprehension' created by defendant's alleged negligence." NYC Asb., 14 A.D.3d at 121, 786 N.Y.S.2d at 34. Rejecting the defendant's argument that this would result in limitless liability, the court reasoned that the group of potential plaintiffs is limited and definable as including the employee's household members who were exposed at home to asbestos fibers brought home on the employee's workplace clothes.[20] Finally, the court noted the fact the defendant-Port Authority provided laundry services for its employees' dirty work clothes created a strong inference of its awareness of *484 the risk that its employees would bring home asbestos-contaminated clothing. NYC Asb., 14 A.D.3d at 120, 786 N.Y.S.2d at 33. We note the same holds true for American Cyanamid.
Given our finding that a duty exists, we now turn to American Cyanamid's argument that there was insufficient evidence to support a finding of causation.

(iii) insufficiency of evidence of causation
Due to the lengthy latency period between exposure and manifestation of the disease, causation has been noted to be the "premier hurdle" faced by plaintiffs in asbestos litigation. Torrejon v. Mobil Oil Co., XXXX-XXXX, pp. 18-19 (La.App. 4 Cir. 6/2/04), 876 So.2d 877, 890-91. "The many types of asbestos products, the many possible places of exposure, the lack of direct evidence of particular product exposure, and the possibility of contributing factors have forced the courts to develop various standards of causation." Torrejon, XXXX-XXXX at p. 18-19, 876 So.2d at 890.[21]
The seminal case addressing the causation problem in asbestos-related disease cases is Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973). In Borel, the federal district court applied a substantial factor standard to find causation satisfied based on inferences, reasoning as follows:
[I]t is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant *485 was the cause in fact of some injury to Borel.
Borel, 493 F.2d at 1094. The Borel court further noted that "[w]hether the defendant's conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ." Id.
Louisiana courts likewise have employed a "substantial factor" test to determine whether exposure to a particular asbestos-containing product was a cause-in-fact of a plaintiff's asbestos-related disease. Egan v. Kaiser Aluminum & Chemical Corp., 94-1939, p. 11 (La.App. 4 Cir. 5/22/96), 677 So.2d 1027, 1034-35 (citing Quick v. Murphy Oil Co., 93-2267 (La.App. 4 Cir. 9/20/94), 643 So.2d 1291); see also Vodanovich v. A.P. Green Industries, Inc., XXXX-XXXX, pp. 3-4 (La.App. 4 Cir. 3/3/04), 869 So.2d 930, 932-933. Although those cases involved product liability defendants and this case involves a premises owner defendant, we find the same standard applies.[22] Simply stated, the exposure has to be a substantial contributing factor to the plaintiff's disease.
American Cyanamid contends that Mrs. Zimko failed to meet this standard. The crux of American Cyanamid's appeal is the lack of factual basis for the opinions of Mrs. Zimko's experts. It contends such a factual basis is necessary to establish Mrs. Zimko's claim that Kenneth Zimko contracted mesothelioma as a result of his childhood exposure to asbestos that his father (Paul Zimko) brought home from the American Cyanamid plant. American Cyanamid argues that Mrs. Zimko's experts, Dr. Roggli and Mr. Parker, erroneously based their opinion on the assumption that Paul Zimko was a boiler worker, which is contrary to Kenneth Zimko's deposition testimony that during the time he was living in the house his father was a boiler house supervisor. American Cyanamid additionally enumerates the following factual predicates on which Mrs. Zimko's experts' opinions are based and on which the record lacks supporting evidence  as opposed to speculation:
 That there was asbestos-containing products at the American Cyanamid site;
 That Paul Zimko worked with asbestos-containing products;
 That Paul Zimko would have been within the "breathing zone" of any such products;
 That Paul Zimko's exposure would have been sufficient to carry home these fibers;
 That the industrial hygiene practices at American Cyanamid, including practices relating to work clothes and showering, were not sufficient to prevent the fibers from being carried home;
 That the levels of fibers, if any, in the Zimko household were substantially in excess of background; and
 That Kenneth Zimko inhaled these fibers.
Given the lack of a factual basis to support the experts' opinions on causation, American Cyanamid argues the trial court erred in giving Mrs. Zimko's experts' testimony any weight on the causation issue. Alternatively, American Cyanamid contends that Mrs. Zimko's experts, at best, established general causationthat asbestos *486 fibers a worker brings home can cause diseasenot specific causationthat asbestos fibers from American Cyanamid's facility actually caused Kenneth Zimko's mesothelioma. American Cyanamid also contends Mrs. Zimko's reliance on circumstantial evidence is misplaced because she failed to exclude other reasonable causes. Indeed, it stresses that the record establishes the cause of Kenneth Zimko's mesothelioma was his exposure to asbestos at Tate & Lyle's Domino refinery during his twenty-four years of employment there.
In finding liability on the part of American Cyanamid, the trial court in its reasons for judgment made the following factual findings:
 Mr. Zimko's father was a boilermaker at the American Cyanamid plant in New Jersey for many years;
 Even though American Cyanamid introduced into evidence two newsletters that suggested that their employees leave their work clothes at the work site, American Cyanamid did not produce any witnesses to dispel the question of asbestos particles that may have been carried home in the hair, on the skin, undergarments and shoes of Mr. Zimko's father (Paul Zimko);
 It is uncontested that Kenneth Zimko died of mesothelioma and that asbestos fibers were found in his lungs.
 While the exposure level in Kenneth Zimko's childhood home in New Jersey may have been lowered by American Cyanamid's practice of providing the work clothes and cleaning them at the work site, "it could not have and did not eliminate the levels that were sufficient to cause or contribute to his mesothelioma."
The trial court thus found Mrs. Zimko met her burden of proving causation.
A trial court's finding of causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous. Egan, 94-1939 at p. 11, 677 So.2d at 1034 (citing Ambrose v. New Orleans Police Dep't Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221).[23] The manifest error rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, p. 6 (La.10/19/99), 748 So.2d 417, 421 (citing Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990) and Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)); McKenzie v. Cuccia, XXXX-XXXX, p. 6 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 339 (noting the deference granted to the fact-finder on appellate review extends to its assessment of expert testimony).
At trial, the only direct evidence of causation Mrs. Zimko presented was Kenneth Zimko's perpetuation deposition in which he testified as to the positions in which his father was employed at American Cyanamid; he stated:
My dad worked for American Cyanamid, and he had several positions that I'm aware of there. And he  he was a mill-wright, *487 he was a machinist, he was a mechanic. He worked for the union for  for a number of years.
Then he was promoted to management, and he was a supervisor in a boiler house, and that's basically the position he had when I was a kid, if you will, late fifties, sixties, and the years I was going to college.
Kenneth Zimko did not recall if his father was provided a change of clothes before he came home from work. He also testified that his father implied that the boiler house he was supervising in New Jersey was big and that it was bigger than the one at Tate & Lyle's Domino refinery.
To establish causation, Mrs. Zimko also introduced testimony from two expert witnesses, Dr. Roggli and Mr. Parker. Without objection, the trial court accepted Mr. Parker as an expert in industrial hygiene and Dr. Roggli as an "expert in lung disease and anatomical and clinical pathology that diagnoses epidemiology and causes of asbestos-related disease, including malignant mesothelioma."
Dr. Roggli acknowledged his status as one of the two or three top experts in the world on the subject of mesothelioma and pathology as it relates to mesothelioma and that he testifies on these subjects for both plaintiffs and defendants. Dr. Roggli also acknowledged that he is the co-author of the textbook, Pathology of Asbestos-Related Diseases. Dr. Roggli testified that he heard Kenneth Zimko's video deposition when it was played at trial and reviewed some of his key records, including his medical records. He testified that more likely than not the cause of Kenneth Zimko's mesothelioma was asbestos exposure and agreed that the issue is the mechanics  "what did it and when."
Dr. Roggli identified five criteria that must be satisfied before he will make a causal link between a mesothelioma and a particular asbestos exposure; these criteria are: (i) the product must contain at least one percent asbestos; (ii) at least some of the asbestos fibers must be five microns or greater in length; (iii) the use of the product must be at dust levels that are substantially above background levels; (iv) the dust that is created must be in the breathing zone of the patient; and (v) the duration of the exposure must be at least several weeks to a couple of months. Dr. Roggli testified that these criteria are used to determine whether more likely than not, the patient would have an increased amount of asbestos in their lungs; whether more likely than not the patient had an asbestos-related mesothelioma; and whether more likely than not any particular exposure would have contributed to that development.
Applying the criteria to the circumstances presented in this case, Dr. Roggli testified that he determined the criteria were satisfied based on the following analysis:
[F]irst of all that the dust came from the use of boilers. And we know that from the sorts of insulation for boilers, that that's going to be at least 1 percent asbestos; that the fibers are going to be at least five microns in length  some of the fibers are at least five microns in length; so that's two of those criteria that are satisfied. Three, that the levels are substantially above background. That information comes from looking at the levels of fibers in the lungs of workers  of individuals with similar household contact exposures who develop mesothelioma. That the exposure  that the person that was exposed to the dust comes from information saying that they were in the household with the worker and the duration of exposure comes from the described duration of who [sic] *488 long they were in the household with the worker.
In his testimony, Dr. Roggli also gave the following additional factors he relied upon in opining that it is more probable than not that Kenneth Zimko's household exposure was a contributing cause of his contracting malignant mesothelioma:
 His father, Paul Zimko, was a boiler worker and millwright in the 1940s and 1950s;
 Such a person would almost certainly have been exposed to levels of asbestos that were substantially above background levels to which we all are exposed;
 Paul Zimko would have brought many of those fibers home with him on his hair, clothing, and shoes;
 Those fibers would have been deposited in the home, eventually entraining themselves throughout the house, which was rather small (fourteen hundred or sixteen hundred square feet);
 Kenneth Zimko would have had a significant exposure to those asbestos fibers in the eighteen years he lived in that house.
Dr. Roggli acknowledged that his ultimate conclusion that Kenneth Zimko's household exposure to asbestos brought home by his father (Paul Zimko) from American Cyanamid was a contributing factor in his contracting mesothelioma was based on historical data and not on any facts related to the actual American Cyanamid site or his father's exposure there. Dr. Roggli further acknowledged he had no information regarding the American Cyanamid plant and that he did not review Kenneth Zimko's father's employment records in forming his opinion. Rather, he testified that the only information he had regarding American Cyanamid was Kenneth Zimko's deposition testimony as to the positions his father held there.
Dr. Roggli characterized all the occupations Kenneth Zimko testified that Paul Zimko had at American Cyanamid, including boiler worker and millwright, as occupations that have resulted in asbestos exposure that is sufficient to cause mesothelioma in the worker. Dr. Roggli further stated that historical studies show that "household contacts" of boiler workers in the 1940s, 1950s, and 1960s have excess amounts of asbestos in their lungs. He further testified based on his own knowledge of asbestos disease research that the fiber type of asbestos a boiler house worker in the 1940s and 1950s would have encountered was typically amosite, the worst kind.
On cross-examination, American Cyanamid's counsel suggested to Dr. Roggli that he had no information regarding Kenneth Zimko's exposure to asbestos fibers brought into his home from the American Cyanamid plant by his father. Dr. Roggli responded that he had a lot of information, albeit based on historical data, about the levels of asbestos and the exposure to workers performing the jobs performed by Paul Zimko during the period of time that he worked in the Bound Brook, New Jersey plant. He also testified that there was ample data to show that such workers brought into their homes, on their person, amounts of asbestos fibers that would expose those residing in those homes to above background levels of asbestos. Dr. Roggli testified that he had been shown nothing that would lead him to conclude that Paul Zimko's exposure to asbestos at the American Cyanamid plant in the 1940s and 1950s and Kenneth Zimko's secondary exposure to that asbestos in the home was an exception to what was going on throughout the country during that period.
Dr. Roggli stated that factors such as where Kenneth Zimko's mother did the *489 laundry, where the laundry room was located, whether the laundry was done inside or outside, and the ventilation system in the house would not affect his ultimate conclusion that more likely than not Kenneth Zimko would have been exposed to asbestos levels above background. He explained that this was because when amosite containing asbestos fibers are brought into a household on clothing, it results in a level above background. He further explained that because the level of amosite in our controlled population is essentially zero any amount brought into the house is above background. He still further explained that such fibers are likely to be a contributing factor, particularly to a family member exposed to such fibers over an eighteen-year period.
Dr. Roggli stated that even assuming Kenneth Zimko's father wore a uniform at work and left the uniform at work, it would not change his opinion that Kenneth Zimko's exposure to asbestos brought home by his father from his workplace contributed to his mesothelioma. Dr. Roggli testified that leaving the uniform at work would reduce the levels of asbestos in the household, but it would not reduce the levels so that they would not be above background. He acknowledged that he would defer to an industrial hygienist to determine the precise exposure level.
In sum, Dr. Roggli testified that it is "almost certain" that Kenneth Zimko's father, Paul Zimko, who was essentially a boiler worker at the American Cyanamid plant in the 1940s and 1950s, would have been occupationally exposed to asbestos. Dr. Roggli further testified that Kenneth Zimko, who lived in the same house with his father from birth until age eighteen, during which time Paul Zimko worked at the American Cyanamid plant, would have been exposed to levels of asbestos that were above background, which, as noted above, is one of the criteria that must be satisfied in order to make a causal connection between a particular exposure to asbestos and contraction of mesothelioma.
Mr. Parker, Mrs. Zimko's industrial hygiene expert, also testified that it was more likely than not that Mr. Zimko, having lived in the Zimko house for eighteen years while his father worked at American Cyanamid, was exposed to levels of asbestos significantly above background. He testified that in the 1940s and 1950s, "the typical power plant had exposure to asbestos and a typical operator would come in contact with it." Mr. Parker, however, acknowledged that he has never visited the American Cyanamid plant in New Jersey and that he did not review Kenneth Zimko's father's personnel file from that plant. Mr. Parker also acknowledged that he could not quantify the exposure to asbestos that Kenneth Zimko's father had at the American Cyanamid plant and that asbestos exposure within an industrial setting could range dramatically. Mr. Parker likewise acknowledged that he was unable to determine the exact asbestos levels in the Zimko house because he did not have a dust count.
In his testimony, Mr. Parker addressed the 1958 newsletter describing American Cyanamid's industrial hygiene policy of providing work clothes to workers, laundering these work clothes at the plant, and possibly offering showering facilities to workers. Under this policy, the worker at the end of a shift put the work clothes in a bin, and the clothes were laundered and later returned to the worker. Mr. Parker opined that this policy was not sufficient to comply with the Walsh-Healy Act because it would not prevent a worker from leaving the plant with asbestos fibers clinging to him. Mr. Parker explained that this policy was insufficient because it did not provide for a thorough decontamination process. *490 Such a decontamination process, he explained, would require separation of the contaminated clothing from the uncontaminated clothing and the cleaning (showering) of the worker. Mr. Parker also commented that the newsletter did not state that it was implemented to prevent asbestos contamination and that he did not believe this was the purpose for this industrial hygiene policy.
In sum, Mr. Parker testified that Paul Zimko's job at American Cyanamid brought him in contact with asbestos and that absent a thorough decontamination process he carried asbestos fibers home. American Cyanamid's policy set forth in its 1958 newsletter was not such a decontamination process. As a result, it was more likely than not that Paul Zimko carried asbestos fibers home.
The trial court found the expert opinions on causation of Dr. Roggli and Mr. Parker credible. As noted, the crux of American Cyanamid's appeal is its argument that the expert opinions lacked a factual basis. Because American Cyanamid's argument focuses primarily on Dr. Roggli's testimony, we likewise focus our analysis on his testimony.
American Cyanamid does not dispute Dr. Roggli's expertise; rather, it disputes the probative value of Dr. Roggli's opinion on causation because it is based on historical data rather than specific information about the conditions at the American Cyanamid plant in Bound Brook, New Jersey in the 1940s and 1950s and in the Zimko house. Because there is no direct evidence of the levels of asbestos in the atmosphere in which Paul Zimko worked or the levels in the home where Kenneth Zimko lived, American Cyanamid contends that Dr. Roggli's opinion is based on speculation and cannot support the judgment against it.
The gist of American Cyanamid's argument is that an expert opinion that is based on circumstantial evidence lacks probative value and cannot establish causation. American Cyanamid stresses that pursuant to La. C.E. art. 705(A), Dr. Roggli was asked on cross-examination to disclose the factual basis for his opinion, and he replied that the only basis for his conclusions was his own expertise and knowledge and Kenneth Zimko's perpetuation deposition.[24] American Cyanamid contends that Dr. Roggli's expertise cannot substitute for facts showing that Kenneth Zimko was exposed to asbestos from American Cyanamid's plant.
American Cyanamid's argument is premised on the general principle that expert testimony given in reply to a hypothetical question that is predicated on a statement of unproven facts has no probative value. See Meany v. Meany, 94-0251, p. 10 (La.7/5/94), 639 So.2d 229, 236. Indeed, American Cyanamid stresses the fact that it objected multiple times at trial on this basis to Dr. Roggli's testimony. However, this general principle confining an expert's opinion to evidence in the record is subject to one exception; namely, "[a]n expert may base his opinion on facts or data not admissible or admitted into evidence if those facts are `of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" 19 Frank L. Maraist, Louisiana Civil Law Treatise: Evidence and Proof, § 11.4 (1999)(citing *491 La. C.E. art. 703).[25] The determination of whether this exception applies is made by the trial court. In determining whether this exception applies, the trial court should accord substantial deference to a qualified expert in the selection of data upon which that expert chooses to base his opinion. See Earl v. Cryovac, A Div. of W.R. Grace Co., 115 Idaho 1087, 772 P.2d 725 (App.1989).
We find Dr. Roggli's reliance on his professional knowledge and experience falls within the exception for two reasons. First, Dr. Roggli testified that much of the data he relies upon in his research and authorship of materials dealing with asbestos-related disease is historical. Second, given American Cyanamid represented in discovery that it could not produce a single witness who could provide any information about the New Jersey plant where Paul Zimko worked in the 1940s and 1950s, the only data upon which anyone could rely in this case was historical. We thus find, contrary to American Cyanamid's contention, that Dr. Roggli was entitled to rely on his experience and knowledge in expressing his opinion.
In the absence of any testimony that conditions at American Cyanamid's Bound Brook, New Jersey plant differed from the industry norm, Dr. Roggli's knowledge of prevailing industry practices and conditions constitutes competent, indeed compelling, evidence that he could rely upon to infer that Kenneth Zimko's household exposure to asbestos fibers was sufficient to cause malignant mesothelioma. See NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776 (7th Cir.2000);[26]see also Torrejon, XXXX-XXXX at pp. 18-19, 876 So.2d at 890-91 (citing Borel, supra). Stated otherwise, we find Dr. Roggli was entitled to make inferences as to the ultimate facts and to do so based on his own experience and knowledge. See La. C.E. art. 705(A). Because Dr. Roggli's opinion that Kenneth Zimko was exposed to above background levels of asbestos from the American Cyanamid plant and that this exposure was a contributing cause of Kenneth Zimko's having contracted mesothelioma is supported by competent expert evidence, we affirm the trial court's finding of liability as to American Cyanamid.

(iv) fault of settling defendant
American Cyanamid argues that the trial court erred both procedurally and substantively *492 in granting Mrs. Zimko's motion for new trial and reversing the finding of fault as to the settling defendant, Eagle. Procedurally, it argues that the trial court although labeling its ruling a grant of a new trial, in effect, granted a judgment notwithstanding the verdict, which is improper in a bench trial. Substantively, it argues the record supports a finding of fault on the part of Eagle. Particularly, it cites Mr. Lou's deposition testimony that Eagle supplied insulation at the Domino refinery before the elimination of asbestos and that "it was a large contract." American Cyanamid stresses Mrs. Zimko's concession in her new trial motion that the trial court's finding that Eagle was a "large supplier" was "a fairly complete summary of the totality of the evidence regarding Eagle's potential liability in this case." We find neither argument persuasive.
As noted, both Mrs. Zimko and Tate & Lyle filed motions for new trial on the basis that the trial court's judgment casting Eagle liable as a defendant (despite Eagle's dismissal based on its settlement) was contrary to the evidence. In granting Mrs. Zimko's motion for new trial and correcting that error, the trial court did not procedurally err.
As to the merits, the trial court's initial reasons for judgment state that "[i]n the past, Eagle admitted to being a major supplier of asbestos pipe insulation at the Domino plant." The trial court's reasons for granting the motion for new trial state that "[a] review of the testimony established that Eagle, Inc. installed non-asbestos containing insulation after the asbestos installation had already been removed." Focusing on the latter, Mrs. Zimko argues the trial court correctly found no fault on Eagle's part as its work at the Domino refinery, if anything, reduced the level of asbestos present. Focusing on the former, and noting that this court in Hoerner, 2000-2333 at p. 16, 812 So.2d at 60, characterized Eagle as a professional vendor, American Cyanamid argues that the trial court erred in failing to find fault on the part of Eagle.
Regardless of which view is taken, we find no error in the trial court's finding that Eagle was not at fault. The record is devoid of any evidence establishing Kenneth Zimko was exposed to any asbestos products supplied by Eagle. Given the lack of evidence establishing Kenneth Zimko was exposed to Eagle's products, we find no error in the trial courts finding of no liability on Eagle's part. As to Eagle's role as an asbestos abatement contractor, the only evidence that Kenneth Zimko was ever exposed to asbestos due to Eagle's conduct was the one occasion when he entered an abatement area momentarily and immediately scampered out. That momentary exposure, if any, was insufficient, as established by Dr. Roggli's testimony, to establish causation. We thus find no error in the trial court's finding that the settling defendant, Eagle, was not at fault.

(v) application of comparative fault to wrongful death
American Cyanamid's final assignment of error is that the trial court erred in failing to apply comparative fault to Mrs. Zimko's wrongful death claim. The basis for this argument is the Louisiana Supreme Court's decision in Walls v. American Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262, which held that a wrongful death cause of action comes into existence on the date of death. Based on Walls, American Cyanamid contends that the law in effect at the time of Kenneth Zimko's death controls the victim's wrongful death action. As a result, it contends that Mrs. Zimko's wrongful death *493 action is governed by the comparative fault principles set forth in La. C.C. art. 2323. We agree.
In allocating fault under La. C.C. art. 2323, a court is required to consider the fault of all responsible parties, including parties immune by statute from tort liability, such as Tate & Lyle. In this case, the record supports the trial court's finding that only two entities were proven to be at fault  Tate & Lyle and American Cyanamid. (As noted above, we find no error in the trial court's finding of no fault on the part of the settling defendant, Eagle.) Given that the record supports the trial court's findings of liability in negligence as to both Tate & Lyle (albeit immune) and American Cyanamid, we find it appropriate to allocate fault equally between them.

DECREE
For the foregoing reasons, we reverse the finding of liability as to Tate & Lyle, affirm the finding of liability as to American Cyanamid, affirm the damage award on the survival action, but amend the damage award on the wrongful death action to reduce that award to 50%, the percentage of fault allocated to American Cyanamid. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.
McKAY, J., concurs in part and dissents in part with reasons.
KIRBY, J., concurs in part and dissents in part.
TOBIAS, J., concurs in part and dissents in part.
BELSOME, J., concurs in part and dissents in part with reasons.
McKAY, J. concurs in part and dissents in part with reasons.
I concur with the majority opinion in so far as it affirms the finding of liability as to American Cyanamid and the damage award on the survival action. However, I respectfully dissent from the reversal of the trial court's finding of liability as to Tate & Lyle and the amending of the damage award on the wrongful death action.
With respect to the defendant, Tate & Lyle, I disagree with the majority's finding that Tate & Lyle's conduct did not rise to the level of an intentional tort. Mr. Zimko was exposed to asbestos levels above background from 1977 through 1990 while working at Tate & Lyle's Domino Sugar refinery in Chalmette. From the early 1970's on it was known that asbestos was an unsafe product that could lead to mesothelioma as well as other lung and respiratory diseases. In 1976, Domino's corporate headquarters issued a directive to its branches to start encapsulating or removing anything covered with asbestos according to OSHA requirements. However, Tate & Lyle did not even begin an asbestos abatement project at the Chalmette facility until 1983. Even after that time, workers at the refinery were still exposed to asbestos. This is a great deal of time to pass from when the danger was realized until any action was taken to correct the problem.
For there to be "intent" on the part of an employer, the defendant must have either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did. Bazley v. Tortorich, 397 So.2d 475, 482 (La.1981). "Substantially certain to follow" requires more than a reasonable probability that an injury will occur and "certain" has been defined to mean "inevitable" or "incapable of failing." Reeves v. *494 Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208, 213. Additionally, the Supreme Court stated that an employer's belief that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act. Id. at 212. In the instant case however, another of the plaintiff's experts, Dr. Brody, testified that it is one hundred percent certain that a person occupationally exposed to levels of asbestos above background will receive lung damage. Furthermore, Dr. Roggli testified that the mesothelium, the organ where mesotheliomas arise, is "primed" by an exposure to asbestos above background and that this condition constitutes cellular injury. Based on the uncontradicted testimonies of both Dr. Roggli and Dr. Brody, it appears certain that workers exposed to above background levels of asbestos will suffer some injury (not necessarily mesothelioma). Therefore, it appears certain and inevitable that some sort of injury would occur to Mr. Zimko because of the levels of asbestos he was exposed to. Accordingly, there was reasonable evidence in the record for the trial court to come to the conclusion that Tate & Lyle committed an intentional tort against Mr. Zimko.
For the foregoing reasons, I would affirm the judgment of the trial court in its entirety.
KIRBY, J. concurs in part and dissents in part.
I concur in the majority's decision to reverse the portion of the trial court judgment finding Tate & Lyle liable to plaintiff, Rochelle Zimko. However, for reasons that follow, I respectfully dissent from the majority's decision to affirm the trial court's finding of liability on the part of American Cyanamid. I would reverse the trial court judgment in its entirety.
In Vodanovich v. A.P. Green Industries, Inc., XXXX-XXXX, pp. 3-4 (La.App. 4 Cir. 3/3/04), 869 So.2d 930, 932-933, this Court stated:
To prevail, a plaintiff in an asbestos case must show, by a preponderance of the evidence, that he was exposed to asbestos from the defendant's products, and that he received an injury that was substantially caused by that exposure. When multiple causes of injury are present, a defendant's conduct is a cause in fact if it is a substantial factor generating plaintiff's harm. Quick v. Murphy Oil Co., 93-2267 (La.App. 4th Cir.9/20/94), 643 So.2d 1291.
There can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature. A plaintiff seeking to recover under either negligence or strict liability theories must prove that the negligent act or defect complained of was a cause-in-fact of the injury. Davis v. State Farm Ins. Co., 558 So.2d 636 (La.App. 1st Cir.1990).
* * *

Quick makes clear that a plaintiff's burden of proof against multiple defendants in a long-latency case is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant's product to the plaintiff's injury. Thus, in an asbestos case, "the claimant must show that he had significant exposure to the product complained of to the extent that it was a substantial factor in bringing about its injury." Asbestos v. Bordelon, Inc., 96-0525 (La.App. 4th Cir.10/21/98), 726 So.2d 926 at 948.
In seeking to prove causation on the part of American Cyanamid for Mr. Zimko's contraction of mesothelioma, plaintiff *495 presented the perpetuation deposition of Kenneth Zimko, and the expert testimony of Dr. Roggli and Mr. Parker. The entirety of Mr. Zimko's testimony[1] as to his father's employment at American Cyanamid was as follows:
Q. One thing I wanted to ask you about is when you were a kid growing up in New Jersey, what did your dad do for a living.
A. My dad worked for American Cyanamid, and he had several positions that I'm aware of there. And he  he was a millwright, he was a machinist, he was a mechanic. He worked for the union for  for a number of years. Then he was promoted to management, and he was a supervisor in a boiler house, and that's basically the position he had when I was a kid, if you will, late fifties, sixties, and the years I was going to college.
Q. To your knowledge, was your father ever provided a change of clothes before he came home from work from the Cyanamid plant?
A. I don't recollect.
Dr. Roggli testified that his opinion was that Kenneth Zimko's "household exposure" to asbestos through living at home with his father during his childhood years while his father worked at American Cyanamid was more likely than not a substantial contributing factor in Kenneth Zimko's contraction of mesothelioma. He also concluded that the exposure levels were above background. Dr. Roggli stated that this opinion was based on the assumptions that for his entire 18-year childhood Kenneth Zimko lived in the same, fairly small house[2] and that his father was essentially a boiler house worker at the American Cyanamid plant in the 1940's and 1950's. He said that those were the factors he relied upon as true in concluding that there were asbestos fibers in the Zimko household during Kenneth Zimko's childhood years, and that the asbestos came into the household from the father's workplace through clothing, hair or other items. Dr. Roggli stated that even if Kenneth Zimko's father wore a uniform at work and did not bring his uniform home, it would not change his opinion that Kenneth Zimko's exposure to asbestos brought home by his father from his workplace contributed to his mesothelioma. He said that leaving the uniform at work would reduce the levels of asbestos in the household, but it would not reduce them so that they would not be above background. He said he would defer to an industrial hygienist to determine the precise exposure level.
Dr. Roggli stated that boiler workers and millwrights are occupations that have resulted in asbestos exposure that is sufficient to cause mesothelioma in the worker. He said he had no information regarding the American Cyanamid plant, and he did not review Kenneth Zimko's father's employment records in forming his opinion. The only information he had regarding American Cyanamid was Kenneth Zimko's deposition testimony as to his father's job descriptions. He stated that historical studies show that "household contacts" of boiler workers in the 1940's, 1950's and 1960's have excess amounts of asbestos in their lungs. He admitted that his ultimate conclusion that Kenneth Zimko's household *496 exposure to asbestos brought home by his father from American Cyanamid was a contributing factor in his mesothelioma was based on historical information and not on any facts related to the actual American Cyanamid site or on any facts related to the father's exposure.[3]
Mr. Parker testified that in the 1940's and 1950's, "the typical power plant had exposure to asbestos and a typical operator would come in contact with it." His opinion is that, assuming Kenneth Zimko's father simply changed out of his work clothes at work and came home in other clothes with no other precautions, it is more likely than not that the Zimko home in New Jersey had levels of asbestos significantly above background levels. He stated, "a boiler operator under this scenario and what I understand, it's more likely than not he brought fibers home."
He admitted that the exact levels could not be determined without a dust count from that house. He also admitted that he has never visited the American Cyanamid plant in New Jersey, and he did not review Kenneth Zimko's father's personnel file from that plant. Mr. Parker said he could not quantify the exposure to asbestos that Kenneth Zimko's father had at the American Cyanamid site. He also stated that asbestos exposure within an industrial setting could range dramatically.
During Mr. Parker's testimony, he referred to a newsletter from American Cyanamid dated July 25, 1958, which included an article entitled "Set Up New System for Dispensing of Freshly Cleaned Work Clothing." According to that newsletter, American Cyanamid had a policy of providing work clothes to its employees. At the end of a shift, a worker put the work clothes in a bin, and the clothes were laundered and later returned to the employee. Mr. Parker's opinion is that this policy was not sufficient to prevent an employee from leaving the plant with some asbestos on him. However, Mr. Parker admitted that in an earlier deposition he gave in a different case, he stated that to prevent asbestos material from being carried home by an employee, an employer should provide "a change of clothes, a shower program, work clothes versus home clothes  those types of things."
As noted by the majority, the great discretion and deference granted to the fact-finder on appellate review extends to its assessment of expert testimony. McKenzie v. Cuccia, XXXX-XXXX, p. 6 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 339. The weight to be given expert testimony is clearly dependent upon the professional qualifications and experience of the expert, and the facts upon which the opinion is based. Thomas v. Petrolane Gas Service Limited Partnership, 588 So.2d 711, 719 *497 (La.App. 2 Cir.1991). Even uncontradicted expert testimony is not binding on the fact-finder. Gulf Outlet Marina, Inc. v. Spain, XXXX-XXXX, p. 12 (La.App. 4 Cir. 6/25/03), 854 So.2d 386, 393. An expert's opinion is entitled to no weight when based on facts not supported by the record. Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Expert testimony based on speculation, conjecture and mere possibilities cannot support a judgment. Lott v. Lebon, 96-1328, 96-1329, p. 8 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 618.
Based on my review of the evidence presented, I conclude that plaintiff did not carry her burden of proving that Kenneth Zimko was exposed to asbestos brought home during his childhood from American Cyanamid by his father, and that this asbestos exposure was a cause of his contraction of mesothelioma. In her original appellate brief, plaintiff stated that on the issue of the alleged childhood asbestos exposure, "Cyanamid essentially folded its arms and told Plaintiffs to `prove it.'" That statement seems to ignore the fact that the plaintiff in a civil case has the burden of proof. American Cyanamid was not required to present evidence to refute plaintiff's claims against it because plaintiff failed to present a prima facie case on the issue of causation based on childhood exposure. See, Hebert v. Cleans-It, 96-1566 (La.App. 4 Cir. 5/21/97), 695 So.2d 552.
I do not question the credentials of Dr. Roggli or Mr. Parker, nor do I find fault in the trial court's decision to accept them as expert witnesses. However, I do find that the trial court erred in giving weight to their conclusions as to American Cyanamid's liability given the fact that their opinions were based on facts not supported by the record. Neither Dr. Roggli nor Mr. Parker had any specific information regarding asbestos present in the American Cyanamid New Jersey plant during Kenneth Zimko's father's employment there or in the Zimko family home. Furthermore, neither had any specific information regarding what industrial hygiene measures Kenneth Zimko's father practiced during his employment. Mr. Parker testified as to a 1958 newsletter from American Cyanamid regarding its industrial hygiene policy of laundering workers' work uniforms at the plant and offering showering facilities to its workers, but no evidence was presented as to what Kenneth Zimko's father's actual practices were regarding these issues.
In Kenneth Zimko's perpetuation deposition testimony, he merely described the positions held by his father at American Cyanamid. Dr. Roggli admitted that Kenneth Zimko's deposition testimony was the only information he had regarding Mr. Zimko's father job descriptions. Furthermore, he admitted that his ultimate conclusion that Kenneth Zimko's household exposure to asbestos brought home by his father from American Cyanamid was a contributing factor in his mesothelioma was based on historical information and not on any facts related to the actual American Cyanamid site or on any facts related to the father's exposure.
Similarly, Mr. Parker's opinion that the Zimko home in New Jersey had levels of asbestos significantly above background levels was not based on any specific facts regarding Kenneth Zimko's father's exposure to asbestos or the actual amount of asbestos allegedly present in the Zimko home. He admitted that he did not visit the American Cyanamid plant in New Jersey, did not review the personnel file of Kenneth Zimko's father and could not quantify the exposure that the father had at the American Cyanamid site or that was present in the Zimko home.
I find that the opinions of Dr. Roggli and Mr. Parker were based on speculation *498 and conjecture, and not on facts supported by the record. Such evidence cannot support a judgment. Lott v. Lebon, supra. Because plaintiff failed to prove the essential element of causation against American Cyanamid, I find that the trial court erred in finding American Cyanamid liable to plaintiff.
TOBIAS, J., concurs in part and dissents in part.
I respectfully concur in the majority's reasoning and conclusion that Tate & Lyle is not liable. I respectfully dissent from the majority's conclusion finding American Cyanamid liable for the reasons assigned by Judge Kirby.
BELSOME, J. concurs in part and dissents in part with reasons.
I concur with the majority's decision to affirm the trial court's finding of liability on the part of American Cyanamid. However, I respectfully dissent from the majority's decision to reverse the portion of the trial court judgment finding Tate & Lyle liable.
Historically, inaction, ignorance of statutory guidelines and/or safety regulatory protocol have not and should not automatically translate into employer intentional misconduct. However, when presented with the individual facts of this case, the trial court was reasonable in its conclusion, finding employer intentional misconduct contributed to the disease and ultimate death of Kenneth Paul Zimko. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
The record clearly sets out a chronology of industry-wide knowledge, concerning the health hazards of asbestos, dating back to the Walsh-Healy Act of 1951. Nearly, 30 years later (1977), OSHA provided further worker protection guidelines. Yet, as we embarked upon a new millennium, Tate & Lyle continued to unnecessarily expose their employees to asbestos. While the exposure time relevant to Mr. Zimko was from 1977 through 1990, the 2000 videotape exhibit continued to display an unsafe working environment.
Tate & Lyle's inaction and gross negligence, which arguably borders on criminal neglect, must rise to the level of civil intentional misconduct when the consequences of indifference are so severe. Employer behavior that allowed or permitted this exposure should not merely be classified as grossly negligent but defined as employer intentional misconduct. The insidious nature of mesothelioma, "The Working Man's Cancer", together with the half century of industry-wide knowledge clearly support the trial judge's factual finding that Tate & Lyle's conduct rose to the level of employer intentional misconduct. Therefore, I do not believe the trial judge abused her vast discretion in holding that these facts mandated a finding of employer intentional misconduct.
NOTES
[1] Household and bystander exposure are the two principal types of indirect occupational exposure, which do not result from hands-on work with a toxic agent. "Household" exposure occurs "when an individual is exposed to a toxic substance through a family member who has direct occupational exposure to the substance." 1 Lawrence G. Cetrulo, Toxic Torts Litigation Guide § 5:8 (2004). "Bystander" exposure occurs when an individual is exposed indirectly to a toxic substance on the job such as "[a] carpenter who is exposed to welding fumes while working at a construction site." Id.
[2] Dr. Victor Roggli, Mrs. Zimko's expert pathologist, identified the pertinent period during which Kenneth Zimko was potentially exposed to asbestos at the Domino plant as from 1977 to 1990. Dr. Roggli explained that given the latency period of mesothelioma, he would exclude backwards ten years from the date of diagnosis (in this case 2000) in identifying potential causative exposures to asbestos.
[3] Dr. Roggli testified that this single occasion of potential exposure "falls far short" of the required exposure to cause mesothelioma.
[4] As discussed elsewhere, Eagle is a named defendant in this case. In 1983, Tate & Lyle hired Eagle to perform asbestos abatement work at the Domino refinery.
[5] Although Mrs. Zimko's exhibit list refers to this document as the "1951 Walsh Healy Act," this exhibit is actually a copy of the Safety and Health Standards that were promulgated in 1951 pursuant to the Walsh-Healy Public Contracts Act. The relevant standard on which Mrs. Zimko relies is quoted elsewhere in this opinion.
[6] American Cyanamid raises these same grounds as assignments of error on appeal.
[7] As noted, Tate & Lyle made this argument at the close of the plaintiff's case at trial in its motion for involuntary dismissal.
[8] Similarly, in Williams v. Gervais F. Favrot Co., 573 So.2d 533 (La.App. 4th Cir.1991), we noted:

A defendant who believes that he is causing an appreciable risk of harm to another may be negligent and if the risk is great enough his conduct may be characterized as reckless or wanton, but it does not constitute an intentional wrong. The distinction between intent and negligence is a matter of degree. The line has been drawn where the known danger ceases to be only a foreseeable risk and becomes a substantial certainty.
573 So.2d at 540. In Williams, we also declined the plaintiff's invitation to use the criminal intent standard in La. R.S. 14:94A of "foreseeab[ility] that it may result in death or great bodily harm to a human being" for determining an intentional act. 573 So.2d at 542-43. As to the latter point, a commentator has noted that "[c]urrently, the burden of proof on the element of intent in a criminal case is lower than the corresponding burden in a workers' compensation case." Marc Lloyd Frischhertz, Comment, Louisiana Workers' Compensation Scheme: Substantially Certain to Result in an Unsafe Workplace, 50 Loy. L.Rev. 209, 227 (2004).
[9] Bazley involved a co-employee's acts of operating a garbage truck without a working horn, disregarding mechanical and electrical maintenance standards, failing to keep a lookout, failing to stop in a safe place and failing to warn the plaintiff of the danger. The Court found the strict standard for establishing an intentional act was not satisfied.
[10] See also Gaspard v. Orleans Parish School Bd., 96-1754, p. 5 (La.App. 4 Cir. 2/5/97), 688 So.2d 1298, 1302, in which we stated:

The following acts do not fall within the intentional act exception of LSA-R.S. 23:1032(B): (1) allegations of failure to provide a safe place to work, Hood v. South La. Medical Center, 517 So.2d 469, 471 (La.App. 1st Cir.1987); (2) poorly designed machinery and failure to follow OSHA safety provisions, Cortez v. Hooker Chem. & Plastics Corp., 402 So.2d 249 (La.App. 4th Cir.1981); (3) failure to provide requested safety equipment, Jacobsen v. Southeast Distributors, 413 So.2d 995 (La.App. 4th Cir.1982); and (4) failure to correct unsafe working conditions, Dycus v. Martin Marietta Corp., 568 So.2d 592, 594 (La.App. 4th Cir.1990).
[11] As noted, although Kenneth Zimko's entire career at Domino was in management and he always had an office, he testified that sometimes he would take a shortcut through the boiler house, which had overhead pipes covered with disintegrating insulation. He further testified that he believed he was exposed to asbestos because many of those pipes have been covered with metallic sheeting and have the words "contains asbestos" stenciled on the sheeting. As to his exposure at Domino refinery, Dr. Roggli testified that although he had no specific information about the Domino plant, he would have to assume that as a result of the abatement work that was taking place there that fiber levels were released that were above background and that Kenneth Zimko breathed them.
[12] As noted, Kenneth Zimko also testified that he had no involvement in the asbestos abatement projects at the plant, but acknowledged that on one occasion he accidentally barged into a contained area in which abatement was being done but he immediately exited. According to Dr. Roggli's testimony, this momentary exposure was not sufficient to be a cause of Mr. Zimko's disease.
[13] Mr. Parker, however, acknowledged that he neither visited the refinery nor conducted air monitoring there.
[14] This finding is significant insofar as the comparative fault issue addressed elsewhere in this opinion.
[15] Mrs. Zimko's reliance on cases in which this court has reversed a trial court's decision sustaining an exception of no cause of action is misplaced. See De Blanc v. International Marine Carriers, Inc., 99-0482 (La.App. 4 Cir. 12/15/99), 748 So.2d 649; Rayford v. Angelo Iafrate Constr., L.L.C., XXXX-XXXX (La.App. 4 Cir. 1/9/02), 806 So.2d 898. This case is before us after a trial on the merits.
[16] American Cyanamid's specific assignments of error are that the trial court erred by: (i) "accepting expert testimony to establish causation of a claim alleging exposure to asbestos because the experts testified that their opinions were premised entirely on assumed facts, some of which were contrary to the facts in evidence and others were completely devoid of any evidentiary support;" (ii) "entering judgment against a defendant by placing the burden of proof on the defendant to refute the plaintiff's allegations even though the plaintiff had failed to present facts to establish a prima facie case of liability;" (iii) "entering judgment against a premises owner in a case alleging asbestos exposure where the plaintiff's only evidence was, at best, entirely circumstantial, and the plaintiff not only failed to exclude other reasonable hypotheses of causation, she presented substantial proof that another defendant was the source of exposure and the district court found that the other defendant was liable to the plaintiff;" (iv) "finding that plaintiff established either a strict liability or a negligence case because neither the law of New Jersey, which governs plaintiff's claims against premises owner, nor the law of Louisiana provides recovery based on the evidence presented at trial;" (v) "not granting summary judgment dismissing all claims against American Cyanamid before trial because plaintiff's opposition to summary judgment presented no evidence to show that she could establish the essential elements of her case;" (vi) "not granting American Cyanamid's motion for involuntary dismissal at the close of plaintiff's case because plaintiff failed to present evidence of facts that entitle her recovery against this defendant under the law;" and (vii) "granting a motion for new trial by a settling defendant who had been dismissed by final judgment and, without admitting further evidence, reversing the court's finding that this defendant was liable when evidence that plaintiff did not dispute showed that the settling defendant was a major supplier of asbestos insulation at the facility where the decedent worked for 25 years." All seven of American Cyanamid's specific assignments of error allude to the sufficiency of the evidence to support a finding of liability in favor of Mrs. Zimko.
[17] Dr. Brody, who was accepted by the trial court as an expert in pathology, asbestos and its effects on the lungs, testified that damage to the lung after the inhalation of an asbestos fiber occurs within the first hour of inhalation.
[18] We note that American Cyanamid, in its motion for summary judgment, offered the following reasons as to why strict liability under the Civil Code was inapplicable:

Because Kenneth Zimko was not exposed to asbestos on or near American Cyanamid's facility, he cannot recover under La. C.C. art. 660. Because he was not an adjacent property owner, he cannot recover under La. C.C. art. 667. Because his alleged exposure occurred before strict liability was the standard under La. C.C. art. 2317 [i.e., before Loescher v. Parr, 324 So.2d 441 (La.1975), was decided] and because American Cyanamid did not have custody of the asbestos fibers that allegedly clung to his father's clothes, he cannot recover in strict liability under article 2317.
In its reasons for denying American Cyanamid's motion for summary judgment, the trial court rejected the argument that the garde or custody of asbestos fibers is transferred to the unsuspected worker leaving the plant and thus American Cyanamid is exonerated of liability. As noted, we find it unnecessary to reach this issue as we find liability based on negligence.
[19] Categorical (or per se) no duty rules are described as categories of cases in which for various reasons, including administrative convenience, the jurisprudence denies recovery to a class of plaintiffs or for a certain type of damages. Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law § 3-2 (1996). Such categorical rules have been recognized in cases involving "failure to act, injuries to unborn victims, negligently inflicted mental anguish or purely economic harm unaccompanied by physical trauma to the claimant or his property." Id. at § 5-2 (emphasis supplied).
[20] We recognize the contrary holding in CSX Transp., Inc. v. Williams, 278 Ga. 888, 608 S.E.2d 208 (2005). In that case, the Georgia Supreme Court, relying on Widera and disagreeing with NYC Asb., held that "Georgia negligence law does not impose any duty on an employer to a third-party, non-employee, who comes into contact with its employee's asbestos-tainted work clothing at locations away from the workplace." CSX Transp., 278 Ga. at 892, 608 S.E.2d at 210. This holding, however, recognizes a "no duty" defense in a context that is not subject to a categorical per se no duty rule by relying on a case that involved such a rule, Widera. Indeed, in NYC Asb., the court distinguished Widera on that basis  that it involved an unborn tort victim. See also Olivo v. Exxon Mobil Corp., 377 N.J.Super. 286, 872 A.2d 814 (2005) (following NYC Asb. and rejecting as unpersuasive the holding in CSX Transp.).
[21] In discussing the signature nature of mesothelioma, the disease at issue in this case, we noted in Torrejon:

Mesothelioma, an unusual, lethal form of cancer, can develop from relatively short, high-intensity exposure to asbestos, as opposed to asbestosis, which develops as a result of relatively high levels of exposure over fairly lengthy periods. Egan [v. Kaiser Aluminum & Chemical Corp.], 94-1939, p. 12 [(La.App. 4 Cir. 5/22/96)], 677 So.2d [1027,] 1035. Mesothelioma is a classic example of a signature disease. A signature disease is one which is "extremely rare in the general population but far more prevalent among those exposed to a particular substance; the disease in a sense bears the signature of the substance." Daniel A. Farber, Toxic Causation, 71 Minn. L.Rev. 1219, 1251-52 (1987). For this reason, a commentator suggests that the proper approach to causation is to apply "an irrebuttable presumption of causation in mesothelioma cases." Id. As another commentator points out, "[e]ven `easy' toxic tort causation cases are based on statistical correlations, but ones so strong and so exclusive that courts have little trouble believing them." Steve Gold, Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence, 96 Yale L.J. 376, 384 n. 43 (1986)(citing as illustrative the extremely strong link between asbestos exposure and mesothelioma).
The causal link between asbestos exposure and mesothelioma contraction has been demonstrated to such a high degree of probability, while at the same time few if any other possible causes have been identified, that a universal causal relationship had been recognized; to wit: if A is diagnosed as having mesothelioma and A was exposed to asbestos, A's exposure to asbestos is recognized to be the cause of A's mesothelioma. In re Joint Eastern and Southern Dist. Asbestos Litigation, 827 F.Supp. 1014, 1026 (S.D.N.Y.1993), rev'd on other grounds, 52 F.3d 1124 (2nd Cir.1995).
Torrejon, XXXX-XXXX at p. 22-23, 876 So.2d at 892-93.
[22] We note that in NYC Asb., the court reasoned that although the defendant-Port Authority was not a manufacturer or supplier of asbestos products, but rather a premises owner, "the core of the analysis is the same in determining the scope of duty owed to third parties." NYC Asb., 14 A.D.3d at 119, 786 N.Y.S.2d at 32. We find the same holds true in determining causation.
[23] Although American Cyanamid argues that the issue in this case on causation is not credibility (a factual issue), but rather sufficiency of the evidence (a legal issue), the Louisiana Supreme Court has held the applicable standard of review in addressing sufficiency of the evidence is manifest error. See Hall v. Folger Coffee Co., XXXX-XXXX (La.4/14/04), 874 So.2d 90, 99 (citing Nabors Drilling USA v. Davis, XXXX-XXXX (La.10/21/03), 857 So.2d 407, 416)(holding the applicable standard of review in addressing the sufficiency of the evidence is manifest error).
[24] La. C.E. art. 705(A) provides:

In a civil case, the expert may testify in terms of opinion or inference and give his reasons therefore without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
[25] La. C.E. art. 703, which tracks the parallel federal rule of evidence, provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
[26] Asserting an argument similar to that made by American Cyanamid, the defendant in NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776 (7th Cir.2000), contended that the plaintiff-NutraSweet's expert's opinion was speculative because it was not supported by direct evidence. Rejecting that argument, the court reasoned that NutraSweet's expert, Dr. Ball, unlike a lay witness, was not required to have direct evidence or personal knowledge; rather, "[a]s an expert witness, Dr. Ball could use his `specialized knowledge' of reliable techniques and methods (as opposed to `specialized knowledge' of the incident in question) to form an opinion." NutraSweet, 227 F.3d at 789. The court further noted that the expert could combine the data he gathered from test results and his specialized knowledge and "come up with a theory (or opinion) as to where the solvents came from and how they got there." Id. Continuing, the court noted that the expert could use the test results and his experience and make an inference, including one that embraced the ultimate issue. Id. (citing Fed.R.Evid. 704(a)(expert opinion can be based on an inference and embrace an ultimate issue)).
[1] The testimony appears in Mr. Zimko's perpetuation deposition received into evidence.
[2] Mrs. Zimko confirms in her trial testimony that the house was quite small based upon her visit to the Zimko family home in New Jersey once after her father-in-law retired from American Cyanamid. The record is silent, however, as to the cleanliness of the dwelling, and does not speak to the cleanliness of the dwelling when Kenneth Zimko was growing up there.
[3] I note from deposition testimony forming part of the record before us that Mr. Zimko's 80-year old mother was alive and presumptively available to testify at trial in person or by deposition, albeit I do not know the state of her health and her ability to testify about facts relevant to this case. Similarly, I note that Mr. Zimko's younger sister who lived in the New Jersey family home with him was alive and presumptively available to testify in person or by deposition, although I do not know if some impediment existed as to her ability to give testimony in this case. Either one of them could have answered any one of the following questions which would have added significantly to the circumstantial evidence against American Cyanamid: (1) Did Paul Zimko change clothes at the plant before coming home? (2) Did he bathe and/or shampoo his hair at the American Cyanamid plant before coming home from work each day? (3) Did he change his shoes before returning home from work? (4) Did he bring any materials from work home? (5) How dirty was he when he came home from work? (6) What were Paul Zimko's job duties at American Cyanamid?